MILLER *v.* MILLER.

(Division A. January 21, 1935. Suggestion of Error Overruled, March 4, 1935.)

[159 So. 112. No. 30756½.]

Watkins & Eager, of Jackson, and Kennedy & Geisenberger, of Natchez, for appellant.

R. M. Kelly and Brunini & Hirsch, all of Vicksburg, for appellee.

Argued orally by **W. H. Watkins, Sr.,** and **L. T. Kennedy,** for appellant, and by **J. B. Brunini** and **R. M. Kelly,** for appellee.

**Cook, J.,** delivered the opinion of the court.

This is an appeal from a decree of the chancery court of Warren county, Mississippi, declaring a divorce previously obtained by the appellant, George W. Miller, Sr., in a proceeding against his wife, Mrs. Mary H. Miller, in the chancery court of Garland county, Arkansas, to be fraudulent, and granting the appellee a divorce from her said husband, and awarding her alimony in the sum of fifty thousand dollars, and an additional sum of five thousand dollars as a reasonable attorney's fee.

The appellee filed an original bill of complaint against her husband, George W. Miller, Sr., and various banking and business institutions, and certain other parties not

necessary to be here named. The bill alleged that the appellee and George W. Miller, Sr., were married on the 1st day of January, 1908, and immediately established their home and residence in the city of Vicksburg, Mississippi, where the appellant was born and reared and has resided all his life; that they continued to live together as husband and wife, in comparative peace and harmony, until 1921; and that there was born of this wedlock one son, George W. Miller, Jr., who was then over the age of twenty-one years, and had continuously resided with the appellee, his mother, in the city of Vicksburg, since his birth.

The bill contained the usual averments as to the performance of the duties of a loyal and faithful wife, and contained averments as to the aid and assistance she had given her husband in accumulating, by his business efforts, a substantial fortune, which was later substantially increased by inheritance from his father's estate. It was further charged that about September, 1921, persistent rumors of infidelity on the part of her husband were conveyed to her, and that, about that time, his demeanor toward her changed, and he became entirely indifferent to her happiness and comfort, and, despite her efforts to restore their former pleasant and cordial relations, he continued to grow more irritable and distant, and became, apparently, uncomfortable in her society, and absented himself more and more from their home and her society.

It was further charged that, after the appellant's conduct with different women of questionable character became almost a public scandal, to the embarrassment and humiliation of herself, her son, and appellant's relatives and friends, and after evidence of the truth of the continued reports of infidelity on his part came to her, she accosted him with the charge of infidelity, and he admitted the truth of the charges; that, in order to shield the family from further public humiliation and embar-

rassment, upon the insistence of her said husband, and upon his distinct promise to cease his improper conduct, she agreed to remain in the home, without cohabitation, but that, notwithstanding his promises, he thereafter continued his association with lewd and questionable characters, and finally entirely withdrew from the home, and that "after her said husband withdrew from her home, as aforesaid, and while complainant was doing her utmost to properly rear and train their said son, and over her protest and entreaties, the defendant continued a life of licentiousness; that he grew bolder and bolder in his association with immoral characters; that he drank greatly, to excess almost daily; and that he became so enamored with one of said characters that he provided apartments for her in the said city of Vicksburg, furnishing her with an automobile, and all of the comforts and luxuries of life; that he has openly and notoriously lived and cohabited with her, and that he still continues at the present time to live and cohabit with and provide for said immoral character to complainant's humiliation, mortfication and shame, as well as that of her son, his friends and his other relatives."

It was further alleged that during the years following the withdrawal of her husband from her home she had numerous interviews and conferences with him concerning business matters, at which times she remonstrated with him concerning his immoral conduct, and entreated him, for the sake of his mother and public decency, if not for the sake of herself and their child, to discontinue his immoral course; that other relatives and friends who were interested in the welfare of herself and her son advised with her husband and endeavored to persuade him to discontinue his immoral course, all to no effect; and that the said conduct of her husband continued throughout many years, causing her such humiliation, mortification, mental pain and anguish as to constitute cruel and inhuman treatment, which entitled her to a divorce.

The bill further charged that the appellant had a large estate, consisting of money, stocks, bonds, securities, and other valuables, on deposit in the defendant banks, and also other real and personal property of large value, a detailed statement of which was set forth in the bill and exhibits thereto. It was further charged that her husband's wealth and property had been accumulated since their marriage, and partly as a result of the help and assistance of appellee, that he had threatened and intended to convey, incumber, and secrete his property so as to defeat her marital rights therein, and that it was necessary to impress a lien thereon to protect her rights therein, and her right to temporary and permanent alimony and attorney's fees.

The bill further charged that the appellant had endeavored to secure appellee's consent to a divorce, and that in so doing his purpose and desire was to marry a woman with whom he was then living and whom he was supporting in a state of luxury; that, upon his failure to secure her consent to a divorce, he left the city of Vicksburg on or about March 27, 1932, and went to the state of Arkansas for the purpose of there securing a divorce and defeating her of the just rights to which she was entitled under the laws of the state of Mississippi; and that on May 28, 1932, he caused to be delivered to her a copy of a complaint in equity alleged to have been filed in the chancery court of Garland county, Arkansas.

The bill of complaint specifically denied every charge of fault or wrongdoing toward her husband as alleged in the Arkansas complaint, including the charges that she had been guilty of such indignities to him as to render his condition and life intolerable, that she had treated him with rudeness, contempt, abuse, and neglect, making it impossible for her said husband to longer live with her, and charged that said allegations were not only false and untrue, but were made with the fraudulent purpose on the part of her husband to procure a divorce from her, and

to deprive her of her just rights in his estate. She further denied every allegation of faithfulness on the part of her husband, and charged that he had done everything within the category of infidelity, disloyalty, and disregard of the feelings, common respect, common honor, and common decency that was due her by her husband, and that he had willfully and fraudulently made the allegations found in the Arkansas complaint in the furtherance of his fraudulent purpose.

The bill of complaint further denied that her husband was an actual bona fide resident of Garland county, Arkansas, or that he had been such a resident for more than sixty days prior to the commencement of the action in Arkansas, and charged that the appellant's resort to the Arkansas courts was for the purpose of defeating her of her equitable rights, and for the purpose of securing to her husband an unfair and unconscionable advantage, and of vexatiously harassing and oppressing the appellee. There were set forth at length the pertinent provisions of the divorce laws of the state of Arkansas, and the reasons why the proceeding in the Arkansas court would be oppressive and would deprive the appellee of her legal rights, and charged that any divorce secured by her husband in the state of Arkansas in pursuance of his fraudulent purpose, and upon his false claim of residence in that state, and the false and fraudulent charge of grounds for the divorce, would be without territorial effect in this state, and should and would be treated as void by the courts of this state.

Upon these averments, in addition to the prayer for divorce and alimony, she prayed that appellant be enjoined from further prosecution of his suit in Arkansas and from entering into the bonds of matrimony with the named defendant, with whom it was alleged he was then living in adulterous relations, and also prayed that the several other defendants, who were alleged to have in their possession property and effects of the said appel-

lant, be enjoined from delivering or paying over said property to him, and that the appellant be enjoined from conveying or incumbering in any manner any of his real and personal property, except such as might be absolutely necessary for the carrying on of his businesses, and for his reasonable personal expenses.

Upon the filing of this bill of complaint, the preliminary injunction prayed for was issued, and a copy thereof was delivered to the appellant in Arkansas on June 13, 1932, and it was also served upon his counsel and on all the resident defendants, but he proceeded with his suit and secured a decree dissolving the marriage and attempting to cancel the appellee's title to the home in Vicksburg which the appellant had deeded to her many years before. Thereafter, on July 20, 1932, the appellee filed her supplemental bill, reiterating the charges of her original bill in reference to the fraud the appellant was undertaking to perpetrate upon her and upon the chancery court of Warren county, Mississippi, and charging that, in defiance of the injunction of said court, he had proceeded with his suit in Garland county, Arkansas, and had obtained a pretended decree dissolving their marriage, and praying that said decree, a copy of which was attached to the bill, should be set aside and declared to be void, for the reason that the Arkansas court was without jurisdiction to render it.

The appellant answered the original and the supplemental bills of complaint, and denied all the charges of fraud or wrongdoing on his part, and all charges tending to show that the harmonious marriage relations between him and the appellee were broken up by reason of any fault on his part, and averred that he had moved to the state of Arkansas with the purpose and avowed intention of abandoning his residence in Mississippi, and establishing a residence in Arkansas, with the intention of permanently residing there. He expressly denied that he moved to the state of Arkansas for the purpose of

fraudulently instituting a suit for divorce by falsely and fraudulently claiming that he had established his residence in Arkansas, or that he had falsely and fraudulently set up grounds for a divorce, or that he had obtained said divorce through fraud, or for any fraudulent purpose.

The evidence submitted at the hearing of the cause bearing upon the marriage relations of the parties, the conduct and alleged infidelity of the husband, the amount, character, location, and value of the property of the respective parties, and the income therefrom, is very voluminous. No useful purpose would be served by detailing herein, to be recorded in the printed page, the evidence tending to establish the infidelity of the husband. It will be sufficient to say that the appellant's admissions of illicit relations with various women, which were made to his wife, and repeated in the presence of his wife's mother, and his admission of continued illicit relations with a named woman, which was made to his son, were amply corroborated by facts and circumstances clearly proved, which rendered such admissions competent, and justified the decree of divorce, provided the decree of the Arkansas court is held to have been ineffectual to end the marital status. In the case of Armstrong v. Armstrong, 32 Miss. 279, it was held that, while the admissions of the husband alone are not sufficient to establish the charge of infidelity, such admissions are competent, and, if supported by other proof, or corroborated by circumstances clearly proved which show that they were not made for a collusive purpose, they are sufficient to warrant a decree of divorce.

The appellant herein did not take the witness stand to deny that the admissions were made, or to deny any facts or circumstances shown by the evidence which supported and corroborated the admissions, and offered no evidence whatever to contradict this evidence, or to show any fault or omission of duty on the part of the appellee,

and, upon the whole evidence, she was clearly entitled to a divorce.

The question then arises as to whether or not under the full faith and credit clause of the Federal Constitution (article 4, section 1), or the doctrine of interstate comity, the decree of the Arkansas court attempting to dissolve the bonds of matrimony between the appellant and the appellee is entitled to recognition in this state, and must be held to be effectual to end the marital status and the marital rights of the wife in her husband's estate.

At the outset, the uncontradicted evidence shows that the matrimonial domicile of the parties was in Vicksburg, Mississippi. The wife did not abandon this domicile, and no conduct on her part justified the appellant in abandoning it and establishing another which should become the actual or constructive domicile of the wife. The marital and the legal domicile of the wife continued to be in Vicksburg, Mississippi, as it had existed throughout the period of their married life. The Arkansas court had no jurisdiction of the marriage status of the parties or of the person of the appellee, and she was only constructively served with process to appear in that court or with notice of the pendency of the suit. Under these facts, without reference to whether the appellant was a mere temporary resident of the state of Arkansas for the purpose of securing a divorce, or had acquired a new domicile in that state, the full faith and credit clause of the Federal Constitution does not require that the decree of divorce rendered by the Arkansas court should be recognized or enforced in the courts of this state, and the Supreme Court of the United States so held in the case of Haddock v. Haddock, 201 U. S. 562, 26 S. Ct. 525, 50 L. Ed. 867, 5 Ann. Cas. 1. In that case the marriage was performed, and the complainant resided, in the state of New York. The husband had acquired a domicile in the state of Connecticut, and, in answer to a suit of the wife in a New York court, the husband pleaded a

decree of divorce obtained in Connecticut upon constructive service. The New York court declined to give effect to this decree, and, upon appeal to the Supreme Court of the United States, the question presented was whether or not the failure or refusal of the New York court to recognize and give effect to the Connecticut decree violated the full faith and credit clause of the Federal Constitution. In a lengthy opinion which analyzed and considered many federal and state decisions bearing upon the subject, it was held, as stated in the syllabus, that: "The mere domicil within the state of one party to the marriage does not give the courts of that state jurisdiction to render a decree of divorce enforceable in all the other states by virtue of the full faith and credit clause of the Federal Constitution against a nonresident who did not appear and was only constructively served with notice of the pendency of the action."

It may be accepted as settled that one state may, upon the principles of interstate comity, recognize and give effect to a divorce granted in another state, though not the matrimonial domicile, upon constructive service of process, to one who had a bona fide domicile in that state, although such divorce is not within the protection of the full faith and credit provision of the Federal Constitution; but it is also a well-recognized principle that such recognition and effect will not be given to a divorce granted, upon constructive service of process in a state other than that of the matrimonial domicile, and in which neither party is domiciled. Bell v. Bell, 181 U. S. 175, 21 S. Ct. 551, 45 L. Ed. 804; Andrews v. Andrews, 188 U. S. 14, 23 S. Ct. 237, 47 L. Ed. 366; Haddock v. Haddock, 201 U. S. 562, 26 S. Ct. 525, 50 L. Ed. 867, 5 Ann. Cas. 1; Ward v. Ward (W. Va.), 176 S. E. 708.

In determining what recognition and effect, if any, the courts of this state will, under the doctrine of interstate comity, give to the decree of the chancery court of Garland county, Arkansas, it is important to keep in view

the divorce laws of that state, as construed by its Supreme Court. An examination of the divorce laws of that state as set forth in section 3500 of Crawford & Moses' Digest of the statutes of Arkansas shows that a divorce may be granted where either party "shall offer such indignities to the person of the other as shall render his or her condition intolerable," and this was the sole ground upon which a divorce was sought in the copy of the complaint that was delivered to appellee. By Act No. 71, Acts 1931, p. 201, section 3505 of Crawford & Moses Digest was amended so as to require a residence of only two months before the commencement of an action for divorce and three months before final decree therein, instead of the former prerequisite of one year's residence. In construing the effect of the said Act No. 71, in the case of Squire v. Squire, 186 Ark. 511, 54 S. W. (2d) 281, the Supreme Court of Arkansas said that this act "does not provide that the plaintiff must, at the time of becoming a resident of this state or at the time of trial, have a 'permanent intention . . . of making Arkansas her permanent home.' All that is required in this respect is that proof must be made of a residence in this state of two months before suit is brought and of three months before final judgment. The statute makes no mention of a permanent intention of making Arkansas a permanent home. Under the old statute, section 3505, Crawford & Moses' Digest, it was necessary to allege and prove, in addition to a legal cause of divorce, a residence in this state for one year next before commencement of the action. Under this statute this court held in Wood v. Wood, 54 Ark. 172, 15 S. W. 459, that actual and not constructive residence was contemplated. . . . But it has never been held that the plaintiff must have had a permanent intention to make this state a permanent residence. We have held that absence from the state for a few months on a visit, being temporary, did not inter-

fere with the residence once established. Wood v. Wood, 140 Ark. 361, 215 S. W. 681. . . .

"She frankly admitted that she came to this state to obtain a divorce; that she would remain here if she could secure employment to support herself and child. Even though she moved to this state to bring a divorce suit and had the intention of leaving after the divorce was granted, this would not deprive the court of jurisdiction, if she were actually and in good faith a bona fide resident for the period prescribed by the statute."

It will thus be noted that the divorce law of the state of Arkansas ignores the question of domicile or residence animo manendi, but only requires a bona fide residence for three months before the judgment or decree is entered, although such residence is established for the sole purpose of securing a divorce, and with the intention of leaving the state immediately after the divorce is granted. As construed by the court in the Squire case, supra, the bona fide residence required by the Arkansas statute may mean merely an intention to sojourn at the pleasant resorts of that state for the limited period of three months, with such temporary absences during that period as may be desired for business reasons, the purposes of pleasure, or the gratification of the mere whims of inclination, and the residence for this limited period may be for the sole purpose of securing a divorce and thereby dissolving the matrimonial status existing in another state and securing a release from the obligations imposed thereby.

There is nothing in the public policy of this state that requires or suggests that a divorce granted under these circumstances, on constructive service of process, should be recognized and given effect as a dissolution of the matrimonial relations of parties whose matrimonial domicile is in this state. To give recognition and effect to such a divorce would be contrary to the public policy of this state, as exemplified in its statutory enactments

and the decisions of its courts. Section 1415 of the Mississippi Code of 1930 confers jurisdiction on the chancery courts of this state in divorce proceedings, where one party has been an actual bona fide resident within this state for one year next preceding the commencement of the suit, but that this contemplates the establishment of a residence which shall be equivalent to permanent domicile is shown by the next provision of this statute, which requires the court to refuse to take jurisdiction, or to dismiss the suit, when it appears, or is made to appear, that the residence was acquired for the purpose of securing a divorce.

The state of Arkansas has the undoubted right to make such laws for the government of its own inhabitants as it may deem proper, and the courts of that state have the right to render judgments and decrees, pursuant to such laws, fixing the rights, relations, and status of its citizens, but, when such judgments or decrees, which purport to affect or determine the marital status and rights of citizens of this state, are contrary to the public policy of this state, our courts will determine, for themselves, the jurisdiction of that court to render such a decree or judgment, and the consequent validity thereof, and this notwithstanding the recitals of the decree of the jurisdictional fact of residence or domicile.

In the case now before us, the appellant pleaded in bar of the wife's action the decree of the chancery court of Garland county, Arkansas, properly authenticated, and this placed upon the appellee the burden of overcoming by proof all presumptions legally arising from the rendition of such decree. The proceedings in the Arkansas court and its decree appear to be regular in form, and consequently such decree imports the existence of all facts necessary to its lawful rendition: but it does not import the existence of any fact not so necessary. It appears that the courts of the state of Arkansas are authorized to grant divorces without requiring that either party

shall be in good faith domiciled in that state, and they may grant divorces on condition that the complaining party has resided in that state for the limited period of three months, for the sole purpose of securing a divorce, and without reference to his or her intention to remain or become permanently domiciled there. Consequently, no presumption arose from the mere rendition of the decree pleaded in this case that the appellant was in fact a resident of the state of Arkansas in good faith, with the intention of remaining and acquiring a permanent domicile there; and, in order that this decree should have any validity and effect in this state, the burden was upon the appellant, who pleaded it and relied on it, to prove the existence of such facts as would show that he acquired a domicile in the state of Arkansas. We do not think he has met this burden.

The appellee offered evidence which strongly tended to prove that the appellant did not leave the city of Vicksburg, Mississippi, for Arkansas until on or after Sunday, March 27, 1932, and that, consequently, he had not been in the state of Arkansas for the two months required by the statute of that state when he filed his suit on May 25, 1932. But, in view of the fact that the son of the appellant, at one point in his testimony, manifested some uncertainty as to whether it was Friday before Easter Sunday, March 27, 1932, that he had a conference with his father in Vicksburg and resigned his position as an employee of his father, we will not treat the evidence tending to show that the appellant left this state on or after March 27, 1932, as conclusive. The evidence shows, however, that the appellant had, for many years, been engaged extensively in the automobile business in the city of Vicksburg; that he was sales agent in that territory for several different makes of automobiles; that he carried a large stock of automobile parts, and was extensively engaged in the repair and sale of used cars; and that, for the purposes of this business, he owned and

operated two large business establishments or garages. He was also interested in other business enterprises located in the city of Vicksburg, and owned considerable real estate there. When he left Vicksburg and went to Hot Springs, Arkansas, he carried only an automobile, his clothing, and fishing tackle. He made no disposition of any part of his property, and had taken no steps whatever to dispose of this property prior to the time he was enjoined from so doing, almost three months later. It does not appear that, when he left Vicksburg, Mississippi, he notified any of his family, friends, or employees of any intention to remove from the state, or that he made any provision for the permanent supervision and operation of his extensive business enterprises. When he arrived at Hot Springs, Arkansas, he engaged rooms in an apartment hotel, and there lived in idleness until the divorce decree had been obtained.

While it is true that he testified that it was his intention to return to Vicksburg and liquidate his affairs after he had secured his divorce, still we do not think that, in view of all the circumstances in evidence tending to show a lack of intention to abandon his domicile in this state and tending to discredit the witness, this mere statement of the witness was sufficient to show the establishment of a bona fide domicile in Arkansas and justify us in reversing the chancellor upon that point. On the contrary, we think the evidence strongly supports the view that the appellant had not abandoned his domicile in this state. Consequently, the decree of the court below will be affirmed in so far as it held the Arkansas divorce was invalid and had no effect on the marital status of the parties in this state, and awarded the appellee a divorce from the appellant.

In holding that the Arkansas divorce decree was invalid and of no effect on the marital status and rights of the parties, we have disposed of the appellant's next contention that permanent alimony cannot be allowed in an-

other suit after a judgment for absolute divorce has been rendered.

It is next contended by the appellant that the court below erred in allowing the appellee permanent alimony, for the reason that no necessity for support existed. The contention is, in substance, that the appellee was shown to have a separate estate which, if judiciously invested and managed, would be sufficient for her support, and consequently no alimony should be allowed. It is true that the appellee has a substantial separate estate in possession and expectancy, all of which, except her home in Vicksburg, was acquired by inheritance from her blood relatives, but that fact is not conclusive of her right to alimony and does not end the inquiry. Section 1421, Code of 1930, provides that, when a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having due regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders touching the maintenance and alimony of the wife, or any allowance to be made to her. In construing this statute in the case of Armstrong v. Armstrong, 32 Miss. 279, the court said: "There appears to be no fixed rule upon this subject, but it depends upon the discretion of the court, to be exercised with reference to an equitable view of all the circumstances of the particular case, the only general rule being, that the wife is entitled to a support corresponding to her rank and condition in life, and the estate of her husband. These principles are recognized by our statute, which provides, that the court may make such allowance 'as from the circumstances of the parties and the nature of the case may be fit, equitable, and just.' "

In discussing the application of the equitable rule recognized and established by our statute, the court further said in the Armstrong case that "it is very generally agreed that it is proper to consider not only the respective pecuniary condition of the parties, their capacities

for supporting themselves, and many other circumstances touching an equitable appropriation of the property of the husband, but also the demeanor and conduct of the wife during the marriage, as tending either to excuse or to aggravate the offence of the husband. Bishop, sec. 612. And if, by the criminality of the husband, the wife is driven to dissolve the conjugal tie, and subjected to all the mental sufferings and social disparagement arising from such a position, it is but just that she should receive a liberal allowance from him who has done her such irreparable wrong."

The basic right to alimony, the allowance of which is authorized by this statute, is found in the nature of the marriage relation and the continuing legal duty of the husband to support his wife. It arises out of the marriage contract, and the legal duty of the husband to support his wife so long as they live together is in no wise lessened or released by reason of the fact that she may happen to have a separate estate out of which she might wholly or partially support herself. This legal duty imposed upon the husband is an absolute one, and is not measured by a comparison of the relative values of the estates of the contracting parties. And, if this be true while the parties are living together in peace and harmony, there is all the more reason why it should be true where the erring husband, by his immoral conduct or criminality, has broken up the home and compelled the wife to live separate and apart from him. Certainly it is true that, under such circumstances, the wife should not be required to consume the corpus of her estate in providing support for herself, while the erring husband, through his own fault, wins a release from his obligations to her. In the Armstrong case, supra, it was held that the respective pecuniary condition of the parties and their capacities for supporting themselves were proper elements for consideration. The court also there held that, in determining the amount that should be allowed,

the court might consider the conduct of the respective parties, and make an allowance to the wife for any mental sufferings and social disparagement arising from the position forced upon her by the fault of her husband. Considering all these elements, and particularly their respective pecuniary condition and their capacities for supporting themselves, we think the appellee should be granted alimony in a sum sufficient, if prudently invested, to produce an income, which, together with the income from her separate property, will maintain her in the station and condition in life to which she was accustomed before the dissolution of the marriage.

There is some suggestion that the husband should not be required to support the wife in a state of idleness, and that she should be required to exhaust her earning capacity to contribute to her support. The appellee was shown to be now about forty-five years of age, and it appears that she has spent her life in her home performing the necessary household duties. There is no evidence that she has had any business training or that she has any earning capacity, and it is a matter of common knowledge that a woman who has reached or passed middle life, and who has had no business training or experience, has little, if any, earning capacity, and we do not think that such a woman, whose home has been broken up by the grievous fault of her husband, should be required to go into the business world to undertake to earn a living, when the erring husband has sufficient means to provide for her, and particularly where, as here, he has a very large estate.

There is also the further contention that the appellee should be required to convert her nonincome-bearing property into income-bearing securities or property, and thereby she should be able to increase her income to an amount sufficient to maintain her in the social position in life to which she has been accustomed. It is true that the evidence shows that about one-half of the appellee's sep-

arate estate consists of real estate, improved and unimproved, from which the income is barely sufficient to pay the carrying charges, but we do not think that, under the circumstances of this case, she should now be required to engage in the hazardous business of disposing of this real estate and changing these investments under the business conditions which have prevailed for the past several years.

It is next contended that the court below erred in allowing alimony in a gross or lump amount. The right of the court to allow alimony in a lump sum, under some circumstances, is too well recognized by this court to be now questioned. In the Armstrong case, supra, the right of the court to allow alimony in a lump sum was vigorously challenged by counsel, but the court approved an allowance of a gross sum amounting to one-third of the husband's estate. In the case of Guess v. Smith, 100 Miss. 457, 56 So. 166, 167, Ann. Cas. 1914A, 300, the court, in discussing the elements to be considered in fixing an allowance of alimony in a lump sum, and the nature of such an allowance, said: ''When alimony is commuted to a lump sum, to be paid presently, as in this case, in fixing the amount the court takes into consideration the possible remarriage of the wife to a husband able to support her, and any and all other contingencies which might arise. It is a settlement between the husband and the wife as to the interest of the latter in his property, and as to the extent of the husband's duty to contribute to her maintenance and support.''

The solution of the question of whether or not an allowance of a gross sum should be made must be determined by the facts of the particular case, having due regard to the best interest of the parties and the husband's financial ability to respond to an award in gross. Where the husband's estate is sufficient to enable him to respond to an award in gross, it will often be conducive to the welfare and happiness of both parties to end the

relation of debtor and creditor between them by making such an award, and thereby relieve the wife of further dependence upon the continued solvency of the husband and his financial ability to pay a periodical stipend and his continued response to such forced contributions without future legal steps to enforce them.

The appellant next contends that the court below erred in allowing alimony in the sum of fifty thousand dollars, with an additional sum of five thousand dollars as attorneys' fees, making a gross allowance of fifty-five thousand dollars. It would be wholly impractical, within the limits of this opinion, to give even a synopsis of the very lengthy testimony of accountants, bookkeepers, and other witnesses as to the amount, character, and value of the estates of the respective parties. After a very careful and repeated study of the evidence and the analyses thereof as made by respective counsel, we think a reasonably accurate estimate of the value of these estates may be made. The appellee is shown to have an estate valued at between eighty thousand dollars and ninety thousand dollars. It consists in part of real estate valued at about forty-eight thousand dollars, from which the income is barely sufficient to pay the taxes and other carrying charges. She owns bond and building and loan certificates from which she derives an income of a little less than two thousand dollars, and she also owns an unsecured promissory note for six thousand dollars, upon which she presumably receives an interest return at the legal rate, which gives her a gross annual income of about two thousand three hundred dollars, provided the annual interest on this note is collected.

The appellant did not himself take the witness stand to testify to his worth or the amount and value of his assets, but, from the evidence of an accountant and the appellant's bookkeeper and office manager, it seems apparent that he has visible assets of a value considerably in excess of two hundred thousand dollars, after deduct-

ing as an existing and unpaid obligation a disputed promissory note for thirty-six thousand dollars, payable to his mother, which was found among his papers at his place of business.

Considering the respective financial condition of the parties, and all the facts in this record, we think the appellant should be required to contribute to the appellee a gross sum which, if judiciously invested, will yield an income which, added to her present income, will be sufficient to maintain her in a style suitable to her condition in life, and to which she has been accustomed during her married life. There was testimony tending to show that during the many years that these parties have lived apart the husband has contributed from four hundred dollars to five hundred dollars per month for her maintenance in their former home, but we do not think that under the changed business conditions he should be required to supplement her income to an amount that would enable her to expend that amount in supporting herself. A gross contribution of thirty thousand dollars, if judiciously invested, should give her a gross income of little in excess of three thousand six hundred dollars per year, or three hundred dollars a month, which we think is adequate, and all that should be required, and the allowance will be reduced to that sum.

The appellant finally contends that the court erred in allowing attorneys' fees to the appellee, for the reason that the record shows that she was amply able to employ counsel to prosecute her suit. The bill of complaint herein prayed for "suit money, counsel fees pendente lite and alimony pendente lite," but no interlocutory decree for such allowances was sought or granted, and the allowance of attorneys' fees to the appellee in the final decree was for services already rendered. As said by the court in Parker v. Parker, 71 Miss. 164, 14 So. 459, the allowance of attorneys' fees should be limited the necessities of the case. This record shows that the appellee

had ample means to employ counsel to prosecute her suit, and that she has done so, and we have concluded that no attorneys' fees should have been allowed, and that she should be required to pay her counsel out of her separate estate as augmented by the alimony allowed. In so holding, however, we should not be understood as intimating that, upon this record, the allowance made was excessive. Upon that point we express no opinion whatever.

The decree of the court below will therefore be affirmed in all respect, except as to the amount of alimony. In so far as the decree allowed the appellee alimony in the sum of fifty thousand dollars and five thousand dollars as attorneys' fees, it will be reversed, and a modified decree will be entered here allowing her alimony in the sum of thirty thousand dollars.

So ordered.