## Owens *v.* Owens

No. 40886          October 27, 1958          106 So. 2d 59

*Arrington & Arrington,* Hazlehurst, for appellant.

*Armstrong & Hoffman*, Hazlehurst, for appellee.

Hall, J.

The appellant and the appellee were married on September 25, 1938, and by virtue of their marriage contract 'they lived and cohabited as husband and wife until July 16, 1956. · During the period of their married life both parties had lived in and established a home in Copiah County. The appellant is a dredge boat operator and the appellee has gone at his request to various places to live with him, including South America and Houston, Texas.

In recent years they had become interested in the raising of cattle and at the time of their separation, according to the undisputed proof, she was the owner of 46 head of cattle and he was the owner of 27 head. For a while her cattle were kept on the farm originally belonging to her mother, which she inherited under the will of her mother, consisting of 305 acres in Copiah County. In 1952 or 1953 the parties decided that they would go into the cattle business and accordingly they purchased 173 acres in Copiah County for the sum of $15,000. The deed was made to both the husband and wife as tenants in common. Later they decided to build a home on this land and accordingly they started construction of a home in 1955 and it was completed and they moved in on November 16, 1955. The cost of the home was between

$11,000 and $12,000. Appellee paid several thousand dollars on the cost of the home. After the home was started the husband requested the wife to return to Copiah County where she could watch the progress of the construction and keep the workmen supplied with such materials as they might need, and she accordingly left Houston, Texas, where they were residing, and came back to Copiah County and supervised the construction of the home.

On November 16, 1955, the husband had quit his job in Houston, Texas, and came and helped in the moving into the new home, and he remained there about 10 days or 2 weeks helping get the place straightened up and then he went to Harvey, Louisiana, a suburb of New Orleans, and obtained employment there as a dredge boat operator, so that he could return home each weekend. Up until this time both parties had apparently gotten along together wonderfully.

A few months later Mr. Owens became enamored with a woman working in the office of his employer, and on July 16, 1956, he left home at the conclusion of the weekend and went back to Harvey, Louisiana, and has never returned.

There was a mortgage on the home on which there was a balance due and on August 17, 1956, he returned to Hazlehurst and the parties made a payment reducing the balance to $6,000 and the note was renewed for that amount plus interest.

On August 14, 1956, the appellee went to New Orleans and carried the appellant a wedding ring for his birthday because he had lost the one which he had. When she got there she telephoned the appellant and he told her to remain where she was and that he would come down there, which he did. He then told her that he had found another girl friend and that he would have to carry her back to Hazlehurst. They left New Orleans after dark and arrived at the home in Hazlehurst about 2 o'clock in

the morning, but in the meantime, before they left, he telephoned his "girl friend" and she wanted to talk to his wife and the appellee talked with her on the telephone. On reaching Hazlehurst at that hour of the morning he was too tired to undertake the trip back to New Orleans without some rest and at her insistence he remained at home and rested until morning and then returned to New Orleans.

It appears from the record that this so-called "girl friend" and the appellant had rented an apartment in Harvey, Louisiana, and were living together in open adultery as husband and wife.

After he returned to New Orleans this "girl friend" telephoned the appellee and talked to her and then passed the telephone over to the appellant and he told the appellee that this "girl friend" was then sitting on his lap. On that occasion he requested that his clothes be sent to him and the appellee complied with this request.

This so-called "girl friend" even had the nerve to write letters to the appellee and the appellant has brazenly brought her to Copiah County on several occasions, one of which was a family reunion at his brother's home near Brookhaven. In addition they were seen together in Hazlehurst a number of times and on one occasion, before the institution of this suit, she went with him to the office of his lawyer. He was evidently very interested in obtaining a divorce and told the appellee that he had learned that he would not be able to obtain one in New Orleans and wanted her to agree that he could get a divorce in Hazlehurst. She of course did not consent to this.

After he learned that he would be unsuccessful in obtaining a divorce he concocted a scheme to get all the cattle off the place in Copiah County and move them to New Orleans, evidently for the purpose of selling them, and he came to Hazlehurst one night and evidently spent the night there and got up real early in the morning and

went out to the place with a man who was helping him corral the cattle, and the noise which the cattle were making awakened the appellee and she discovered that a lot of the cattle had already been put into the cattle lot. While he was busy trying to catch other cattle and get them penned up she opened the gate and let these cattle out and then got in touch with her lawyer in Hazlehurst, who prepared a suit for separate maintenance and for an injunction to prevent him from removing the cattle from Copiah County. Fortunately this suit was filed in short order and the appellant was personally served with process and with an injunction before he left the County.

On at least two occasions the appellant has had the "girl friend" in the car with him and they have driven slowly past the home in question, which is not very far from Hazlehurst.

According to the undisputed proof he was making at the time of the filing of the suit $600 a month as a dredge boat operator, but since the suit has been filed he has been promoted to the rank of superintendent of the dredging operations and is drawing a salary estimated to be about $800 per month plus automobile expenses up to $100 per month.

At the trial of this case the appellant did not appear and did not testify. Evidently he was afraid "to face the music". His lawyer stated into the record that he had been told that it was not necessary for him to come to court unless he wanted to and he chose not to come.

In the final decree the chancellor awarded the appellee $150 per month separate maintenance and also the use and possession of the home place as long as she desired to use the same as a homestead. In this connection the court noted in its decree that there was an indebtedness of $6,000 due to the Bank of Hazlehurst and that the same was in default at the time of the trial, but that the Bank had agreed to renew the indebtedness upon pay-

ment of $1,000 plus past due interest thereon, and the court found that the appellant does not intend to help discharge the indebtedness due on the place nor to support the appellee. At the time of the final decree there was $56.63 in a joint bank account of the parties and the appellee had possession of U. S. Savings Bonds of the maturity value of $525, said bonds being payable to either the appellant or the appellee. The court found that the appellant had been trying to sell the cattle and also the homestead, having listed the same with a real estate agent in Hazlehurst. The decree authorized the appellee to cash in said bonds and also to have a sufficient number of the cattle belonging to the defendant sold through the Faichild's Livestock Commission at Hazlehurst to pay the amount necessary toward renewing the note, and also provided that if the appellant should fail to renew the indebtedness on the homestead the clerk of the court was directed to sign his name as commissioner of the court provided the bank will accept such renewal note, and the appellee was directed to look after the remaining cattle as she has done in the past, and to sell the same through the Fairchild's Livestock Commission when it is advisable to do so and to use the money received therefrom as a part of her monthly support or to apply the same on the indebtedness due on the homestead and to furnish the appellant a report of the cattle operations at least once annually, provided the appellant is regular in his monthly support payments, and the temporary injunction which was granted at the time of the filing of the suit was made perpetual. The appellee was granted a lien against all the property of the appellant and his interest in the real estate for any and all support money allowed.

From that decree the husband appeals, and contends first that the lower court erred in failing to take into consideration the income of appellee in fixing the amount to be paid by the appellant for the support of appellee. In this connection counsel for appellant call attention to

the fact that the record shows that the appellee owns 305 acres of land which she inherited from her mother in Copiah County, and also owns a one-fourth interest in an undetermined number of cattle inherited from her father, and also an undivided one-fourth interest in two separate tracts of land in Oklahoma consisting of 325 acres. We do not think it makes so much difference as to the property owned by the appellee unless there is also a showing that it produces some income, and in this case the income from the property mentioned is relatively small and is far from amounting to as much as $150 per month. It is also pointed out that she owns $3,000 in bonds in her own name and $1,548 in a personal bank account as well as an automobile. No doubt it is necessary for her to have an automobile but it is far from an income producing instrumentality.

There is little difference between a suit for separate maintenance and a suit for alimony and substantially the same principles of law apply in fixing an amount.

In the case of Miller v. Miller, 173 Miss. 44, 61, 62, 159 So. 112, these principles are laid down as follows:

"It is next contended by the appellant that the court below erred in allowing the appellee permanent alimony, for the reason that no necessity for support existed. The contention is, in substance, that the appellee was shown to have a separate estate which, if judiciously invested and managed, would be sufficient for her support, and consequently no alimony should be allowed. It is true that the appellee has a substantial separate estate in possession and expectancy, all of which, except her home in Vicksburg, was acquired by inheritance from her blood relatives, but that fact is not conclusive of her right to alimony and does not end the inquiry. Section 1421, Code of 1930, provides that, when a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having due regard to the circumstances of

the parties and the nature of the case, as may seem equitable and just, make all orders touching the maintenance and alimony of the wife, or any allowance to be made to her. In construing this statute in the case of Armstrong v. Armstrong, 32 Miss. 279, the court said: 'There appears to be no fixed rule upon this subject, but it depends upon the discretion of the court, to be exercised with reference to an equitable view of all the circumstances of the particular case, the only general rule being, that the wife is entitled to a support corresponding to her rank and condition in life, and the estate of her husband. These principles are recognized by our statute, which provides, that the court may make such allowance ''as from the circumstances of the parties and the nature of the case may be fit, equitable, and just.'' '

''In discussing the application of the equitable rule recognized and established by our statute, the court further said in the Armstrong case that 'it is very generally agreed that it is proper to consider not only the respective pecuniary condition of the parties, their capacities for supporting themselves, and many other circumstances touching an equitable appropriation of the property of the husband, but also the demeanor and conduct of the wife during the marriage, as tending either to excuse or to aggravate the offence of the husband. Bishop, Sec. 612. And if, by the criminality of the husband, the wife is driven to dissolve the conjugal tie, and subjected to all the mental sufferings and social disparagement arising from such a position, it is but just that she should receive a liberal allowance from him who has done her such irreparable wrong.'

''The basic right to alimony, the allowance of which is authorized by this statute, is found in the nature of the marriage relation and the continuing legal duty of the husband to support his wife. It arises out of the marriage contract, and the legal duty of the husband to support his wife so long as they live together is in no wise lessened or released by reason of the fact that she

may happen to have a separate estate out of which she might wholly or partially support herself. This legal duty imposed upon the husband is an absolute one, and is not measured by a comparison of the relative values of the estates of the contracting parties. And, if this be true while the parties are living together in peace and harmony, there is all the more reason why it should be true where the erring husband, by his immoral conduct or criminality, has broken up the home and compelled the wife to live separate and apart from him. Certainly it is true that, under such circumstances, the wife should not be required to consume the corpus of her estate in providing support for herself, while the erring husband, through his own fault, wins a release from his obligations to her.''

In the case of Gardiner v. Gardiner, 93 So. 2d 638, not yet reported in State Reports, this Court awarded to the wife the use and possession of a homestead valued at $35,000 or $40,000. It appeared that the wife had received a substantial amount of money under the will of her mother and the husband owned common stocks listed on the New York Exchange of the value of approximately $90,000. The wife had also inherited from her deceased sister property of the value of $10,000, and in that case an award of $250 per month to the wife was approved by this Court.

See also to the same effect of the case of Barber v. Barber, No. 40,866, decided October 6, 1958, not yet reported.

██ ██ The appellant next contends that the lower court erred in ordering the appellant to renew the note evidencing the indebtedness at the Bank of Hazlehurst, in placing a lien upon all of the property owned by the appellant and in prohibiting him from disposing of his cattle. The appellant says that the decree divested the appellant of his property and gave the same to the appellee, which of course is contrary to the decisions in Mis-

sissippi, but we do not so interpret the decree. She was merely given a lien upon the property.

The appellant also complains that the decree is in error in authorizing the appellee to sell all or a portion of the cattle. The decree does not so authorize the appellee, but it does authorize her to deliver the cattle for sale through the Fairchild's Livestock Commission.

■■ We take judicial notice of the fact that in this section of the country there is a cattle sales auction in almost every county seat and in the larger places, and that cattle will bring a better price when sold through regular channels in such auction than they will bring at a private sale or at a public auction held by a commissioner of the court, and the direction to have the cattle sold at the Fairchild's auction was to the appellant's advantage rather than to his diadvantage. The property was not turned over to the appellee, as contended by the appellant, with a free hand to dispose of it as she saw fit.

The parties hereto evidently realized that the cattle would bring more money by sale at Fairchild's Livestock Commission because when there was an award of temporary separate maintenance before the hearing on the merits the attorneys for both parties approved in writing a decree which authorized a sale of the cattle at the Fairchild's Livestock Commission.

There is abundant authority in Mississippi including all of the cases hereinabove mentioned, which authorize the impressing of a lien upon the husband's property to secure the payments of alimony or separate maintenance to the wife. See also the case of Gates v. Gates, 215 Miss. 298, 60 So. 2d 778.

The appellant says that the decree in this case is indefinite and leaves a great deal to be determined by the appellee in the light of circumstances as they developed. We do not think that it is indefinite, but on the contrary it is very definite and we think that the appellant should

congratulate himself over the fact that the lower court was as lenient with him in view of the circumstances of this case, as the decree appears to be.

Affirmed.

*Roberds, P. J.,* and *Lee, Holmes* and *Ethridge, JJ.,* concur.