612 So.2d 353 (1992)
Rebecca MONROE
v.
James MONROE.
No. 91-CA-997.
Supreme Court of Mississippi.
December 17, 1992.
*354 Roger H. McMillin, Jr., Sumners Carter & McMillin, New Albany, for appellant.
Pamela Loftin Hall and Michael Malski, Carnathan & Malski, Amory, for appellee.
Before ROY NOBLE LEE, C.J., and SULLIVAN and PITTMAN, JJ.
PITTMAN, Justice, for the court:
The Appellant, Rebecca Monroe, was awarded a divorce on the grounds of desertion. By mutual agreement, custody of the two minor children was granted to the natural father, James (Jim) Monroe. Pursuant to the divorce, the Chancellor awarded Rebecca Monroe $12,000 in lump sum alimony. Following the divorce, Rebecca experienced bouts with mental illness, and was committed to Charter Hospital for care. Rebecca's attorney filed a motion for a new trial, which was denied by the chancellor. After considering the circumstances of this case, we find that the chancellor abused his discretion in failing to award Rebecca Monroe any periodic alimony.

I.
Jim Monroe and Rebecca Webb Monroe were married on August 21, 1970 in Brandon, Mississippi. Both being recent college graduates, the couple moved to Fort Worth, Texas, to enable Jim to attend Southwest Theological Seminary. Jim had earned a Bachelor of Arts degree in psychology from Mississippi College, and was interested in a counseling curriculum at the Seminary in Fort Worth. Rebecca supported the family by working as a teacher's assistant there for the year. However, when Christmas came, Jim decided that the counseling program was not for him. After expressing his desire to attend medical school, Jim was told that he needed to improve his undergraduate grades. The Monroes moved to Hattiesburg, Mississippi, so that Jim could attend the University of Southern Mississippi.
Once in Hattiesburg, Rebecca obtained a teaching position at Oak Grove High School, and the couple moved into student housing on the USM campus. Since their marriage, Rebecca supported the couple on her teacher's salary. Following a year of teaching at Oak Grove High School, Rebecca worked at the Small Business Administration for the summer, before accepting a teaching position at Prentiss High School for the next year. Rebecca made this ninety mile commute each day for three years. Jim, while enrolled as a full time student, *355 was employed as a student worker on campus, working at the greenhouse and occasionally washing dishes.
After five and a half years at USM, Jim was accepted into the Kansas City College of Osteopath Medicine in 1976. The Monroe's moved to Independence, Missouri, where Rebecca got a teaching position in the Grandview Public School System, some twenty-five miles away. While in medical school, Jim was awarded a public health scholarship, which paid for his tuition and books, as well as giving him a $400 stipend to be used for living expenses. This scholarship is given to individuals who agree to work in rural environments following graduation in lieu of repaying the government for the student loans. The Monroe's were able to live in a subsidized townhouse system, with an initial cost of $800. When the Monroe's moved out, they were refunded $1,500. The first year of medical school proved difficult for Jim, and the school requested that he repeat his first year. It therefore took Jim five years to graduate from medical school.
While Jim was enrolled in medical school, Rebecca was working three jobs to support the family. Besides her teaching position, both she and Jim worked for their church performing custodial tasks on Sunday and Wednesday nights. Finally, Rebecca worked with children after school each day in an arts and crafts program. The money she received from the arts and craft program, which was about $100 a month, was used as her "pin" money. Rebecca used this "pin" money to buy gifts, furnishings, and pay for some graduate school courses in literature. Rebecca stopped teaching in 1980 when she became pregnant with their first child, Anna. At that time, Jim had one and a half years remaining in medical school.
While Jim was in medical school, Rebecca withdrew money set aside for her retirement, which amounted to $200 from the Mississippi Retirement System and $5,000 from the Missouri Retirement System. This money was deposited in a savings account which covered overdrafts from the Monroe's checking account. By the end of medical school, the savings account had been entirely depleted.
Upon graduation in May, 1981, Jim accepted an eighteen month internship in Battle Creek, Michigan, paying $25,000 a year. After his internship was completed in December, 1982, the family moved to Smithville, Mississippi, wherein Jim accepted employment as a physician with Three Rivers Health Care, Inc. at a starting salary of $54,000. The Monroes were provided with a rent-free house in which they lived for two and a half months before finding a place of their own. The Monroes had another daughter, Sarah in 1983, nine months after moving to Smithville. After having settled in Smithville, the Monroes purchased life insurance policies and began to accumulate savings averaging between $1,500 and $5,000. They soon purchased twenty acres of land nearby, which they had titled jointly.
On August 7, 1987, Rebecca was admitted into Charter Hospital in Jackson for treatment of emotional and psychological problems. Her stay there lasted until September 4, 1987, incurring $9,000 in medical bills. Approximately ten days after her admittance to Charter, Jim brought a deed to the jointly held twenty acres, which he asked Rebecca to sign, to allow him to sell the property and use some of the proceeds to pay her medical bills. Rebecca executed this deed and the property was sold for $20,000. Jim paid Rebecca's $9,000 medical expenses and kept the rest of the money, stating that he paid off the remaining $3,000-4,000 mortgage on the property. Five days after signing the deed, Jim visited Rebecca in the hospital and the subject of divorce was first discussed.
There was another instance while Rebecca was in the hospital where Jim tried to get Rebecca to sign a document giving up her claim to any of Jim's pension benefits. However, even in her vulnerable condition, she refused to sign the document. On the day of Rebecca's release, September 4, 1987, Jim informed her that he wanted a divorce and that she need not return home to Smithville, but should go live with her mother in Brandon. He later left all of her *356 clothes in the hospital waiting room. Rebecca stated that the savings account, checking account, and credit cards had been changed to Jim's name only, thereby denying her access to their use. Rebecca moved to Brandon and lived with her mother.
Jim gave Rebecca $200 that day, and sent the same amount each week. In March, 1988, Rebecca received a letter from Jim stating his intention to stop supporting her as of August, 1989. However, this support stopped in March, 1989. Rebecca did not receive any further support until she was awarded temporary alimony in the amount of $550 a month. During this separation period, both daughters remained in the custody of the father in Amory, Mississippi. Rebecca testified that during the separation period up until temporary alimony was granted, she received $9,100 in support as well as a car and a year's car tag and insurance. Rebecca went back to teaching for two years during this separation, however, she stopped teaching pursuant to instructions from her psychiatrist. She now works at Domino's Pizza, earning $400 a month. Rebecca hopes to return to teaching following her medical leave of absence.
At the time this suit was filed, Rebecca was forty-one years old. She estimates her monthly living expenses at $2,305, which includes allocations for expenses which she presently does not have, such as rent and money for a yearly vacation. Rebecca claims that she withdrew $6,000 from her IRA following her separation, and borrowed $2,500 from her mother to pay legal expenses. She states that she is unable to pay future legal expenses.
Jim projected his 1989 income to be $91,000. This is derived from his $72,000 salary at Three Rivers Health Care, Inc., $15,000 in income received from working in the emergency room at a hospital in Amory, and $4,000 that he received from serving in the National Guard. His income for 1988 was $96,000 and for 1987 was $98,355. Jim attributes this decrease in income to the fact that he works less than in years past, opting to spend more time with his children. At the time of this suit, Jim was forty-five years old. He testified that the only property that he and Rebecca had accumulated during their marriage was the twenty acres of land which were sold to pay Rebecca's hospital bills. He claims that the remainder of the sale proceeds went to paying off the remaining mortgage and to reimburse him for architect's fees associated with landscaping the property. A Deposit Guaranty statement reveals $36,886 in total contributions to Jim's pension plan at Three Rivers Health Care. Jim also lists an IRA at J.C. Bradford consisting of $15,326 and a savings account containing $2,000 as assets. He did not deny the fact that he tried to get Rebecca to sign away her claim to any of his pension fund because he wanted all the money himself.
Rebecca was awarded a divorce on the grounds of desertion. She had tried to reconcile with Jim, but to no avail. Pursuant to the divorce decree, Jim was granted custody of the children and Rebecca was granted visitation rights. The chancellor awarded Rebecca $12,000 lump sum alimony, stating that since she was an educated woman that she should be able to support herself.
Subsequent to the divorce decree, Rebecca was diagnosed as manic depressant and was ordered to be committed to Charter Hospital for treatment on June 13, 1990. This commitment stemmed from an incident where Rebecca was found totally naked outside her apartment screaming and slamming the door. She was arrested and charged with disturbing the peace. An affidavit of her psychiatrist states that Rebecca needs long term care, which would cost about $200,000-$250,000. Following Rebecca's involuntary commitment, her attorney petitioned the chancellor to reopen the case in light of the changed circumstances. After considering the matter, the chancellor held that the changes in circumstances were not enough to warrant any modification of the previous divorce decree. The chancellor stated that he had considered Rebecca's emotional state when he granted her the initial divorce. Feeling *357 aggrieved by the chancellor's ruling, Rebecca appeals on the following grounds:
I. THE AWARD OF $12,000 LUMP SUM ALIMONY AND NO PERIODIC ALIMONY WAS A CLEAR AND SUBSTANTIAL ABUSE OF THE CHANCELLOR'S DISCRETION.
II. THE FAILURE TO AWARD PERIODIC ALIMONY OR TO RETAIN JURISDICTION TO CONSIDER FUTURE AWARD OF ALIMONY WAS AN ABUSE OF DISCRETION.
Finding that the chancellor abused his discretion in denying Rebecca Monroe periodic alimony, we hereby affirm the lump sum alimony, but reverse for failure to award any periodic payment alimony.

II.
This Court will not disturb a Chancery Court's decision concerning alimony unless it is determined to be against the overwhelming weight of the evidence or manifestly in error. McNally v. McNally, 516 So.2d 499, 501 (Miss. 1987); Harrell v. Harrell, 231 So.2d 793 (Miss. 1970). In the case of a claimed inadequacy or outright denial of alimony, we will only interfere where the decision is seen to be oppressive, unjust or grossly inadequate so as to evidence an abuse of discretion. McNally, 516 So.2d at 501; Martin v. Martin, 271 So.2d 391 (Miss. 1972).
A chancellor can award alimony payable in one lump sum or periodic alimony, payable monthly, or both, dependent upon the circumstances of the parties. Tilley v. Tilley, 610 So.2d 348 (1992); McCraney v. McCraney, 208 Miss. 105, 43 So.2d 872 (1950); Miller v. Miller, 173 Miss. 44, 159 So. 112 (1935); J.W. Bunkley W.E. Morse, Amis on Divorce and Separation in Mississippi (1957) § 6.06. Several factors must be weighed when considering an award of alimony: (1) the health and earning capacity of the husband, (2) the health and earning capacity of the wife, (3) the reasonable needs of the wife, (4) the husband's necessary living expenses, and (5) other factors such as estimated amount of income taxes, the use of the family home or automobile, and the payment of insurance. Boykin v. Boykin, 565 So.2d 1109, 1111 (Miss. 1990); McNally v. McNally, 516 So.2d 499, 501 (Miss. 1987); Skinner v. Skinner, 509 So.2d 867, 868 (Miss. 1987); (all citing Brabham v. Brabham, 226 Miss. 165, 84 So.2d 147 (1955)). When considering the reasonable needs of both the husband and wife, we have held that both are entitled to maintain a "decent standard of living," whenever possible. Gray v. Gray, 562 So.2d 79, 83 (Miss. 1990).
When these factors are applied to the present case, the chancellor's abuse of discretion clearly becomes evident. The most significant factor is the disparity between Rebecca's and Jim's income as well as their earning capacity. Jim is in good health and currently earning over $90,000 a year practicing medicine. Dr. Monroe's earning capacity appears steady, with a very good possibility of increasing over time. Rebecca, on the other hand, has experienced a deterioration in her mental state over the last few years, as evidenced by her psychological and emotional treatment at Charter Hospital on two different occasions. While Rebecca's 1987 admittance to Charter was of a voluntary nature, her 1990 treatment was the result of an involuntary commitment by the Chancery Court. Rebecca is currently earning $400 a month delivering pizzas for Domino's, and her prospects of improvement in her earning capacity is around $23,000 at best, being employed as a public school teacher. Rebecca estimates her monthly living expenses at $2,305, while Dr. Monroe lists his at around $2,750. Given Dr. Monroe's significant income, he should have no problem contributing monthly support payments to Rebecca, even though he is responsible for raising their two children. Finally, there was no "marital home," but only a rental house in which Jim and the children remained following Jim's telling Rebecca "not to come home."
It shocks this Court's conscience that the chancellor ignored Rebecca's medically-advised leave from teaching and declared that there was no justifiable reason why she *358 could not obtain gainful employment teaching as a means to support herself. This is especially harsh, considering Rebecca's involuntary commitment by court order to Charter Hospital a mere nine days later. In Klumb v. Klumb, 194 So.2d 221 (Miss. 1967), this Court held that chancery courts of this State are charged with a special obligation and duty to protect those persons coming within their ambit by virtue of their mental problems. Id. at 224-25. This duty should be a substantial consideration in making any award of support in a divorce. It was therefore the duty of the chancellor to try to see that Rebecca, who had a history of emotional problems, be provided for in her present and future mentally disturbed state.
The chancellor was manifestly in error to not grant support to a wife who supported the couple for the first eleven years of their seventeen year marriage, enabling Jim to pursue his academic aspirations. A medical degree was the common goal for both Jim and Rebecca, who both made significant sacrifices to achieve this end. Rebecca began supporting the couple soon after they were married when Jim decided to enroll in the seminary. She continued to be the family bread-winner in Hattiesburg, commuting ninety miles a day for three years to her teaching job while Jim attended undergraduate classes in the hopes of raising his grade point average. When Jim was finally accepted into medical school, they moved to Missouri where she continued to support the couple by teaching at a school twenty-five miles away. At one point while living in Missouri, Rebecca worked three jobs to support the family. As a final attempt to make ends meet, Rebecca withdrew the $5,000 balance of her pension fund in the Missouri Retirement System and the small balance from the Mississippi System. This enabled the financially-strapped Monroes to survive the expenses of medical school until Jim began his internship.
This Court has addressed this same factual scenario on several other occasions. Justice Robertson summed it up best when he stated in McNally v. McNally, 516 So.2d 499 (Miss. 1987):
Today's case presents a question arising with increasing frequency: One spouse in a new marriage attends professional or graduate school while the other earns the couple's keep. After graduation but before the marriage begins to reap the economic benefits of this professional training, the parties get divorced.
Id. at 499. McNally involved a wife supporting the couple while the husband was attending both undergraduate classes in an attempt to boost his grade point average, and then later throughout dental school. Following the husband's graduation from dental school, the wife quit her job in Jackson and accepted a lower paying position in Gulfport in order to accompany her husband's relocation to begin his practice. During the move, the husband requested a divorce. Because of the husband's dire financial condition, the wife was awarded child support but no alimony in the divorce decree. On appeal, we held that the chancellor should have retained jurisdiction of the case so that alimony could be later granted upon the husband's certain increase in income from his dental practice. See also Tilley v. Tilley, 610 So.2d 348 (wife granted lump sum and periodic payment alimony after supporting husband through medical school as well as working at his medical practice.); McIntosh v. McIntosh, 378 So.2d 629 (Miss. 1979) (alimony awarded where wife quit school to work and support couple while husband finished law school). However, unlike in McNally, the fruits of Dr. Monroe's effort in medical school had begun to ripen and pay dividends. There is no reason why Rebecca should not be afforded the benefits of her eleven years of work as the bread-winner of the family. Rebecca contributed everything she had to the marriage, giving her entire savings and later her emotional stability. It is apparent that Jim could not have gotten where he is today without the help and support of his wife. Equity demands that the least Rebecca deserves for all her sacrifices is a lump sum and periodic alimony payments.
Chancellor Ervin committed a severe abuse of discretion when he refused to *359 grant Rebecca any sort of periodic payment alimony. Although the chancellor awarded Rebecca $12,000 in lump sum alimony, this amount standing alone, is insufficient to compensate Rebecca for seventeen years of sacrifice and contribution to the Monroe's marriage. Had the chancellor considered periodic payments in conjunction with the $12,000 lump sum award, this Court could have conceivably affirmed the divorce settlement. We therefore remand this case back to Monroe County Chancery Court for the proper determination and award of periodic payment alimony for the support of Rebecca Monroe, bearing in mind her current and future emotional state. The $12,000 lump sum payment is affirmed.
AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, SULLIVAN, BANKS and McRAE, JJ., concur.
DAN M. LEE, P.J., dissents without separate written opinion.
ROBERTS, J., not participating.