# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 1999-CA-02068-COA

**IN THE MATTER OF THE DISSOLUTION OF THE MARRIAGE OF
CYNTHIA C. PROFILET AND WILLIAM BINDLEY PROFILET, JR:
WILLIAM BINDLEY PROFILET, JR.**                 **APPELLANT**

**v.**

**CYNTHIA C. PROFILET**                                 **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/26/1999 |
| TRIAL JUDGE: | HON. GAIL SHAW-PIERSON |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOHN W. CHRISTOPHER |
| ATTORNEYS FOR APPELLEE: | JESSE LEE HOWELL III |
| | PATRICIA H. COTTINGHAM |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | ALIMONY INCREASED FROM $400 /MONTH TO $4000/MONTH. ATTORNEYS FEES OF $3987 AWARDED. |
| DISPOSITION: | AFFIRMED - 02/06/2001 |
| MOTION FOR REHEARING FILED: | 02/20/01- MOTION DENIED. JUDGE LEE DISSENTS TO THE DENIAL OF THE MOTION FOR REHEARING IN A SEPARATE WRITTEN OPINION - 07/17/01 |
| CERTIORARI FILED: | |
| MANDATE ISSUED: | |

EN BANC:

KING, P.J., FOR THE COURT:

¶1. Cynthia C. Profilet filed a petition to modify alimony provisions of a divorce decree. Following a hearing on May 19, 1999, which her ex-husband, William Bindley Profilet, Jr., failed to attend, the Chancery Court of Madison County granted her petition and ordered William to increase his monthly support from $400 to $4,000 and to pay $3,987.25 in reimbursement for Cynthia's attorney's fees. William appeals, asserting:

    **I. THE COURT COMMITTED MANIFEST AND REVERSIBLE ERROR IN ITS
    ORDER MODIFYING THE FINAL JUDGMENT TO INCREASE THE AMOUNT OF
    PERIODIC ALIMONY;**

**II. THE COURT ABUSED ITS DISCRETION AND COMMITTED MANIFEST ERROR IN CONDUCTING HE TRIAL OF THIS CASE WITHOUT THE TRIAL DATE HAVING BEEN SET ACCORDING TO M.R.C.P. 40 OR 81;**

**III. THE COURT ABUSED ITS DISCRETION AND COMMITTED MANIFEST ERROR IN REFUSING TO GRANT THE DEFENDANT'S MOTION FOR A CONTINUANCE.**

¶2. Finding no prejudicial error, this court affirms.

## FACTS

¶3. William and Cynthia were divorced in 1982 on the grounds of irreconcilable differences. Cynthia was granted custody of the couple's only child, child support and $200 a month in periodic alimony. In 1986, William filed a petition to modify the judgment of divorce, which resulted in an agreed order by which he was granted custody of the child and Cynthia's periodic alimony was increased to $400 a month. On March 16, 1999, Cynthia filed a petition to modify the judgment of divorce by increasing periodic alimony. Cynthia predicated her requested increase upon her debilitating medical problems, and their attendant treatment costs.

¶4. Cynthia presented evidence of total disability due to bi-polar disorder. Dr. Pugh, her treating psychologist, noted that the illness had so progressed that Cynthia cycled from depressed to manic states, often on a daily basis, with little likelihood that medications would significantly improve her condition. Cynthia, who after the divorce worked as a teacher in the Jackson Public Schools for over thirteen years, testified her illness had progressed to the point she could no longer function in a classroom. Dr. Pugh testified that Cynthia's inability to continue working contributed to the severity of her mental condition. Cynthia proved living expenses, of approximately $4,000 per month, and income of $1195.

¶5. The evidence established that William's latest gross income was $479,477, and he had assets of $594,000.

## ANALYSIS

### DID THE COURT COMMIT MANIFEST ERROR

### IN CONDUCTING HE TRIAL OF THIS CASE WITHOUT THE TRIAL DATE

### HAVING BEEN SET ACCORDING TO M.R.C.P. 40 OR 81

### and

### DID THE COURT COMMIT MANIFEST ERROR IN DENYING WILLIAM'S

### MOTION FOR A CONTINUANCE

¶6. This Court deems it appropriate to first address Appellant's issues 2 and 3,. Cynthia filed her petition to

modify the judgment of divorce on March 16, 1999. A summons was issued for William, which recited the date this matter was set for trial. Before the summons was served, counsel for both parties conferred by telephone, and William's attorney agreed to waive service of process. Cynthia's counsel mailed a copy of the summons to William's counsel the next day, March 17, 1999. This summons indicated the trial would be held on May 20, 1999. In accordance with M.R.C.P. 4 (e), William's counsel executed a waiver of process on March 23, 1999, which was filed on April 12, 1999.

¶7. On March 18, 1999, Cynthia's counsel presented an order to the chancery court requesting the hearing date be changed from May 20, 1999 to May 19, 1999. This order was signed by the chancellor on March 18, 1999. Cynthia's counsel mailed a copy of this order to William's counsel on March 23, 1999. William's counsel acknowledged receipt of the March 16, summons, and a copy of the order of March 18, 1999.

¶8. On May 14, 1999, William's counsel filed a motion for continuance, alleging a conflicting prior court setting. The chancery court denied this motion. Neither William nor his attorney appeared on May 19, 1999, and the trial was held in their absence.

¶9. William contends the chancery court erred in allowing the matter to be heard on May 19, 1999 because that date was not set in accordance with M.R.C.P. 81 and 40. William acknowledges that M.R.C.P. 81 was complied with in establishing the original date of the hearing. Further, William concedes that his attorney's waiver of process and actual receipt of the summons via mail was sufficient to satisfy the notice and service of process protections of M.R.C.P. 81. However, he contends that the order amending the hearing date was improper.

¶10. Initially, we note that M.R.C.P. 81 is the exclusive means for setting a hearing date in matters of divorce, alimony and child support. M.R.C.P. 81 (5) provides:

> [U]pon the filing of any action or matter listed in subparagraphs (1) and (2) above, summons shall issue commanding the defendant or respondent to appear and defend at a time and place, either in term time or vacation, at which the same shall be heard. Said time and place shall be set by special order, general order or rule of the court.

Other means of initiating an action or initially setting a matter on a docket are inapplicable in these actions. *See, e.g., Caples v. Caples,* 686 So. 2d 1071, 1074 (Miss. 1996); *Stinson v. Stinson*, 738 So. 2d 1259, 1261-62 (Miss. Ct. App. 1999). Thus, any reliance William places upon M.R.C.P. 40's provisions of how actions are docketed is misplaced.

¶11. William waived formal service of process and accepted the summons through his counsel. That summons listed the date of the hearing as May 20, 1999. The chancery court subsequently entered an order which changed the date to May 19, 1999. Although he admits to having received a copy of this order, William argues that M.R.C.P. 81 was not complied with because the summons and the order conflicted as to the dates.

¶12. M.R.C.P. 81 requires that a party receive a summons which states when the action is to be taken up and whether the trial court requires an answer. *Saddler v. Saddler,* 556 So. 2d 344, 346 (Miss. 1990); *Sanghi v. Sanghi*, 759 So. 2d 1250, 1255-56 (Miss. Ct. App. 2000). It is, the purpose of this rule to provide "reasonable notice and an opportunity to be heard" regarding a M.R.C.P. 81 matter. *Caples v. Caples*, 686 So.2d 1071, 1074 (Miss. 1996). This purpose was fully met. The record reveals that William

(1) received notice, (2) filed an answer to the complaint and (3) participated in discovery.

¶13. Because we find the purpose of M.R.C.P. 81 to have been accomplished, this assignment of error is without merit.

¶14. William also contends that the trial court committed error in denying the motion for a continuance. The summons was issued on March 16, 1999. The order changing the hearing date was executed on March 18, 1999, and a copy immediately made available to William's counsel. The motion for continuance was filed on May 13, 1999, six days prior to the initial hearing date.

¶15. No action was taken on the motion for continuance, and neither William nor his counsel responded to the call of this case on May 19, 1999.

¶16. William was obligated to timely file his request for a continuance. Pursuant to M.R.C.P. 6, (a) and (d) that motion should have been filed 5 working days prior to its disposition. The motion was filed three working days prior to the trial day. The trial, court when appropriate, may excuse the failure to comply with the appropriate time, or shorten that time. M.R.C.P. 6(d). However, such an exception must be based upon a finding of "excusable neglect." *L.W. v. C.W.B.* 762 So. 2d 323 (¶11)(Miss. 2000).

¶17. William offered no facts to justify waiting three working days prior to trial to file a motion for continuance. This failure is particularly acute where he had almost two months notice of the trial setting.

¶18. Finding the absence of excusable neglect, this Court finds no merit in this issue.

## DID THE COURT COMMIT MANIFEST ERROR IN MODIFYING

## THE FINAL JUDGMENT TO INCREASE THE AMOUNT OF PERIODIC ALIMONY

¶19. William asks this Court to hold that the chancellor committed error by awarding increased alimony to Cynthia.

¶20. Cynthia contends that because William failed to defend at the hearing he waived any error going to whether sufficient evidence existed for the trial court to find an increase in periodic alimony was warranted. William contends that his answer to the petition to modify preserved this factual issue. Our supreme court has found that Miss. Code Ann. § 93-5-7 (Rev. 1994) operates to prevent a judgment on the pleadings in a divorce action *Rawson v. Buta*, 609 So. 2d 426, 430 (Miss. 1992). *See also Crowe v. Crowe*, 641 So. 2d 1100, 1102 (Miss. 1994). The general rule of pleading is that a denial to a specific averment is sufficient to preserve the matter in so far as the claimant must produce evidence to support any relief granted. Wright and Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1261 (1990). Indeed, under Mississippi law even where a defendant to a spousal support action has failed to both answer and appear to defend, appellate review extends to determining whether sufficient evidence exists to support the trial court's decisions. *Stinson v. Stinson*, 738 So. 2d 1259, 1264 (Miss. Ct. App. 1999). Therefore, we find that William is not precluded from challenging whether sufficient evidence existed to increase Cynthia's periodic alimony.

¶21. All awards of periodic alimony, are subject to modification upon a finding of a change in circumstances. *Varner v. Varner*, 666 So. 2d 493, 497 (Miss. 1995). *See also Switzer v. Switzer*, 460 So. 2d 843, 846 (Miss. 1984). Where a divorce is granted upon the grounds of irreconcilable differences,

a change in circumstances is typically a change in the parties' circumstances that was not anticipated at the time of the divorce. *See, e.g., Austin v. Austin*, 557 So. 2d 509, 510 (Miss. 1990); *Morris .v Morris*, 541 So. 2d 1040, 1042 (Miss. 1989).

¶22. William contends that no material change in circumstances occurred. He asserts that at the time of the divorce and agreed upon support provisions, as well as the subsequently agreed upon modification, he and Cynthia were both aware that her existing psychological problems required medical treatment. He contends that the chancery court committed manifest error in finding a change in circumstances occurred because Cynthia's mental illness had become so severe as to be debilitating. This argument is without merit.

¶23. In making a determination to grant or deny periodic alimony, the chancery court is mandated to consider the following factors:

    1. Income and expenses of the parties;

    2. Health and earning capacity of the parties;

    3. Needs of each party;

    4. Obligations and assets of each party;

    5. Length of the marriage;

    6. Presence or absence of minor children in the home;

    7. Age of the parties;

    8. Standard of living of the parties both during the marriage and at the time of the support determination;

    9. Tax consequences of the spousal support order;

    10. Fault or misconduct;

    11. Wasteful dissipation of assets by either party;

    12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong v. Armstrong*, 618 So.2d 1278, 1280 (Miss.1993).

¶24. Subsequent changes in these factors, may also provide a foundation to increase, decrease or eliminate periodic alimony. *Id at,* 1281.

¶25. The evidence establishes that there had been a change in the income and expenses of the parties. William's income had soared, while Cynthia's income had significantly deceased. This decrease in income was the result of increased and debilitating medical problems. These increased medical problems precluded Cynthia's gainful employment, while simultaneously increasing her expenses.

¶26. The application of the *Armstrong* factors to this case, demonstrates substantial evidence in support of

the chancellor's actions. Where a chancellor's decision on alimony is not contrary to the overwhelming weight of the evidence, this Court will not disturb that decision. *Monroe v. Monroe*, 612 So. 2d 353, 357 (Miss. 1992). In this case, the chancellor's decision is not contrary to the overwhelming evidence.

¶27. Accordingly, we affirm.

¶28. **THE JUDGMENT OF THE CHANCERY COURT OF MADISON COUNTY IS AFFIRMED. THE APPELLANT IS ASSESSED ALL COSTS OF THIS APPEAL.**

**McMILLIN, C.J., SOUTHWICK, P. J., PAYNE, THOMAS, IRVING, MYERS AND CHANDLER, JJ., CONCUR. LEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BRIDGES, J.**

LEE, J., DISSENTING:

¶29. The majority expresses its view that the chancellor must be affirmed, I dissent. Being mindful of the standard of review to which this Court is bound, that a chancellor's finding of facts must be supported by substantial evidence, *Kilpatrick v. Kilpatrick*, 732 So. 2d 876, 880 (Miss. 1999), my disagreement with the majority is predominantly a concern regarding the evidence upon which the chancellor has relied in making her finding of facts.

¶30. First, the finding of facts states that the parties were married nearly sixteen years off and on. Though the record corroborates this, the statement is misleading because it implies that the issues before the court are in regard to a marriage of a sixteen year duration. Nowhere does the chancellor mention in her finding that the parties were married twice or that they had been divorced twice. The parties separated less than fifteen months after marrying the second time and were divorced four months later. It is the length of this marriage that should have been contemplated by the chancellor when considering the factors listed in *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993), specifically in the issue before us, the calculation of periodic alimony. There is nothing in the record in regard to the date of the first marriage or the date of the first divorce. It simply is not a factor in this case. The first marriage was the subject of another divorce and property settlement and should have been irrelevant to the chancellor in regard to the modification of alimony for the second divorce. This conclusion is logical since the relevant property settlement and other agreements for that marriage would have been a part of the record if the first marriage were to be considered. The modified amount of alimony awarded by the chancellor infers that she considered this to be a marriage of much longer duration than a mere fifteen months. It is apparent from items two and four in the finding of facts that the chancellor so construed the marriage. Those items, including item three, state as follows:

2. That the parties were married nearly 16 years off and on.

3. That the parties filed a Joint Complaint for Divorce alleging irreconcilable differences between the parties on April 15, 1982.

4. That this Court entered a Judgment of Divorce dissolving the marriages of the parties on June 25, 1982.

Scrutinizing item four, we find that it explicitly states that the judgment of divorce dissolved the "marriages" of the parties. The judgment of divorce shows that it dissolved only one marriage, that entered into by the

parties on November 28, 1980. It is clear that the chancellor erroneously considered both marriages as one. There is no precedent which allows for the tacking of marriages.

¶31. Second, the chancellor, in her finding of facts, found that William Bindley Profilet's 1997 tax return showed gross receipts from his medical practice of $479,477. We do not find that figure to be relevant. The record indicates that his adjusted gross income for that year was $239,516 and that he owed $61,758 in taxes, leaving a net income of $177,758. Nowhere does the chancellor mention this figure in her finding, which is just over twice the $80,000 income Ms. Profilet testified that she and her husband had in 1982 when they divorced and which, if correct, was the income upon which her $400 in alimony was based. In addition, William Bindley Profilet's assets from his 1998 financial statement are listed on the chancellor's findings as $594,000. She fails to mention that that financial statement also included liabilities in the amount of $354,691 and that his net worth is listed in that document as only $239,309, an amount much less than one half of his stated assets. Again, it appears that the amount of alimony the chancellor awarded was based on the unsuitable figures listed in her finding rather than those we have indicated which were clearly stated in the record and totally ignored.

¶32. Third, we are unable to find substantial evidence to support the chancellor's finding of fact that Ms. Profilet now requires medication for psychotic episodes or to support the inference that Ms. Profilet currently has a diagnosis of bipolar illness from the finding of fact that she was diagnosed as such in 1998. The only testimony presented in this case is that of Cynthia Profilet and Dr. Sharon Pugh, a psychologist. The record indicates that Dr. Pugh diagnosed Ms. Profilet with bipolar illness in 1998. Dr. Pugh stated in her testimony that she thought it was important that the court know that though she had intermittently treated Ms. Profilet since 1988, she had not treated her since October, 1998, seven months prior to the trial. Ms. Profilet had been hospitalized subsequently to that time, and Dr. Pugh was not privy to any information regarding that hospitalization. Furthermore, Dr. Pugh stated that she did not know who was treating Ms. Profilet at the time nor did she know what medication Ms. Profilet was taking at the time. There is therefore no basis for the finding that Ms. Profilet currently requires medication for psychotic episodes from a medical doctor or psychologist working in concert with a medical doctor who has treated Ms. Profilet subsequently to her hospitalization in November, 1998. Because Ms. Profilet was hospitalized and rediagnosed by another physician subsequently to Dr. Pugh's diagnosis, we do not find that there is any evidence to support that this diagnosis is the current one. Likewise we cannot rely on the fact that Ms. Profilet was receiving social security disability benefits to support her claim in this case since we do not know the basis of that determination, which was made at another time and with other supporting evidence which was not disclosed in this case.

¶33. Ms. Profilet herself testified that she was hospitalized for eight days in November, 1998, six months prior to trial, and that when she was released she saw three different psychiatrists who told her they did not want to see her again. A statement from any one of these psychiatrists could have provided a medical basis for a diagnosis subsequently to her hospitalization; however, there was nothing from any of these sources entered into the record. Other than Ms. Profilet's own testimony, there was no other testimony regarding the medical, psychiatric, or psychological nature of this most recent hospitalization or any other hospitalization. After Ms. Profilet was discharged from the hospital in November, she testified that she began seeing Dr. John Norton, the psychiatrist who was treating her at the time of the trial. Profilet indicated in her testimony that it was Dr. Norton's opinion that she was misdiagnosed when she had been admitted to the hospital and that she should not have been hospitalized. However, because there was no evidence presented by Dr. Norton or the physician who admitted her to the hospital, we have no idea what the diagnosis was when she

was admitted to the hospital or a diagnosis from Dr. Norton. There is nothing in the record regarding the identity of the physician who admitted and treated Ms. Profilet during this hospitalization or the medical basis for the hospitalization. Dr. Norton did not testify nor was any evidence presented from him in the form of affidavits or otherwise regarding Profilet's past, current, or future medical treatment or condition. In fact, there was no professional testimony regarding Ms. Profilet's current medication and anticipated future medication and expenses. There was no evidence presented in any form from any medical doctor who had treated Ms. Profilet in the past or who was currently treating her. Profilet claimed $900 a month ad infinitum in prescription expenses but did not support this with any medical evidence. The chancellor basically relied on Profilet's mere assertions regarding her medical condition, which ran the gambit from a claim that her eyeballs had become too large for her contact lens and she is unable to get them in and out to a need for dental care because her teeth were patched together.

¶34. It is appropriate to mention that the brief reports of two psychologists who had treated Ms. Profilet, other than Dr. Pugh, were entered into evidence. These reports were reviewed by Dr. Pugh when she testified. One psychologist was no longer treating Ms. Profilet and the other, Dr. Elias-Hooper, had only recently begun to see her just prior to the trial. However, Dr. Elias-Hooper nor Dr. Pugh are medical doctors licensed to prescribe the medication Ms. Profilet asserts she must have at the cost of $900 per month. The report of Dr. Elias Hooper, less than a half a page in length, was the only evidence presented at the trial from a professional who was currently treating Ms. Profilet. Dr. Elias-Hooper's report acknowledged that much of her reliance regarding Ms. Profilet's condition was based on information from Profilet herself, rather than from other professionals or test results. That report stated that Ms. Profilet would probably have difficulty maintaining stable psychological functioning in order to effectively cope with social, familial, and occupational situations. This statement is the most profound of all professional evidence presented on behalf of Ms. Profilet's case by anyone currently treating her and does not provide the substance from which a tenfold increase in alimony can be justified.

¶35. Because the basis of the increase in alimony is embedded in Ms. Profilet's medical needs and expenses for medication, it is my opinion that the medical evidence presented was insufficient to support an increase in alimony. It is also evident that William Bindley Profilet's financial status was misrepresented in the chancellor's findings and served as an erroneous basis from which the chancellor calculated the amount of alimony. I therefore dissent and would reverse and render.

**BRIDGES, J., JOINS THIS SEPARATE WRITTEN OPINION.**

**ON MOTION FOR REHEARING**

LEE, J., DISSENTING:

¶36. After a marriage of less than two years duration in which a divorce was granted seventeen years ago, the majority has affirmed the decision of the chancellor to increase alimony from $400 per month to $4000 per month. I find this unconscionable, especially in view of the chancellor's finding of facts, which I find to be manifestly in error. The Profilets were married on November 28, 1980, separated 15 months later, and a divorce was granted on June 25, 1982. It is to be noted that the Profilets were previously married, however, there is nothing in the record in regard to the date of the first marriage or the date of the first divorce, for that marriage was the subject of another property settlement and should have been irrelevant to the chancellor in regard to the modification of alimony for the second divorce, which is the subject of the

case sub judice. It is the divorce for the marriage of 1980 which we are now addressing. When that divorce was granted Cynthia received custody of the only child along with child support and $200 per month periodic alimony. In 1986 William sought and was granted custody of the child and periodic alimony for Cynthia was increased to $400 per month. On May 19, 1999, the Chancellor of Madison County increased the alimony from $400 to $4000 per month. That's $48,000 per year. Although I have previously expressed my opinion in my original dissent, which I reiterate, specifically pointing out numerous manifest errors in the chancellor's finding of facts, I am compelled once again to do so and would grant the motion for rehearing.

**BRIDGES, J., JOINS THIS SEPARATE WRITTEN OPINION.**