NICHOLS, et al. *v.* ESTATE OF SAULS, DECEASED, ETC.

No. 43001          June 8, 1964          165 So. 2d 352

*O. W. Phillips, B. D. Statham,* Magnolia, for appellants.

*Mounger & Mounger,* Tylertown, for appellee.

PATTERSON, J.

This proceeding was begun by the appellants to be declared legitimate children of E. B. Sauls, Sr., who died intestate on March 12, 1959, while a resident citizen

of Walthall County, Mississippi. His widow, Mrs. Mary E. Sauls, administratrix of his estate, and the children, or their descendants, of E. B. Sauls, Sr., and Mattie Dunn Sauls, his first wife, contest this petition.

E. B. Sauls, Sr., hereinafter referred to as Sauls, first married Mattie Dunn on December 18, 1894. To this union there were born five children. Sauls was divorced from Mattie Dunn Sauls on January 14, 1913, in Tangipahoa Parish, Louisiana. On February 13, 1913, he married Katie Quin in Pike County, Mississippi, with whom he lived in Tylertown, Mississippi, the greater portion of the time as husband and wife until the death of Katie Quin Sauls on November 21, 1951. There was no issue of this marriage. Sauls left about the year 1917 with Daisy Eunice Simmons McCaffey, hereinafter referred to as Daisy, a widow who worked in the commissary of Sauls at his sawmill in Morgantown, Mississippi. He returned two or three days thereafter, but continued to intermittently live with Daisy down through the years.

The first place of residence of Sauls and Daisy does not appear in the record. The evidence reflects, however, that Edna Sauls, the oldest child of Daisy and Sauls, was born in New Orleans, Louisiana, on November 7, 1918. There was also born as a result of this relationship, Louisa Sauls, on June 4, 1920, in Donaldsonville, Louisiana; Ruth Sauls, on March 7, 1925, and Mildred Sauls, on January 17, 1928, near Covington, Louisiana. Sauls was a business man who had mill and logging interests in both Mississippi and Louisiana, and traveled extensively in regard thereto. During this period of time Sauls maintained his marriage relationship with Katie Sauls in Tylertown, Mississippi, as well as maintaining a family relationship with Daisy in the State of Louisiana. He was the sole means of support and the head of both families.

Sauls obtained a decree of divorce from Katie Quinn Sauls on July 6, 1936, in the State of Nevada, whereupon he consummated a ceremonial marriage with Daisy in Beauregard Parish, Louisiana, and about this time moved this family, Daisy and the four daughters by her, to Orange, Texas, where Sauls had purchased a residence for them in his name.

From the time Sauls left with Daisy in 1917 he supported and maintained her as his wife until her death on January 6, 1952. She was accepted as his wife in the State of Louisiana as well as Texas. She was recognized as and referred to as Mrs. Saul or Sauls. She appeared to be a typical American housewife, with no suspicion, as far as this record reflects, of any irregularity in her marriage or relationship with Sauls in either Louisiana or Texas. The children were recognized by Sauls as being his children. They were supported by him, their education was provided by him, and on February 5, 1940, in Texas, Sauls adopted as his own one of the granddaughters. Sauls visited and lived with this family on numerous occasions at the residence in Texas. This relationship continued until Daisy's death, at which time Sauls made the funeral arrangements and paid the expenses of the funeral.

During this same time, Sauls also supported Katie Quinn Sauls in Tylertown, Mississippi, in which community they maintained a residence and both were recognized by all as being husband and wife. This relationship, husband and wife, continued without interruption after the Nevada divorce of July 6, 1936, until Katie died on November 21, 1951. Though Sauls was often absent from his residence in Tylertown, Mississippi, he was considered a permanent resident thereof by its citizens, as is evidenced by the fact that he was Alderman of the City from 1947 to 1957, and by numerous witnesses who testified as to his domicile.

Sauls married Mary A. Sauls, his surviving widow, on January 16, 1954, and lived with her in Walthall County, Mississippi, until his death on March 12, 1959. Sauls left no will and his widow was appointed the administratrix of his estate. The inventory of the personal and real property assets of the estate was established at the approximate value of $115,122.60. Included in this aggregate value is 1082 acres of land at $25 an acre and 268½ acres of minerals at $5 an acre.

The record is devoid of any proof that any of the children of Sauls and his first wife, Mattie Dunn, knew of the existence of the appellants, the daughters of Sauls and Daisy, prior to her death in 1952, and then only by surmise as the result of a telephone call by one of the daughters to one of the children of Mattie Dunn Sauls at the time of the death of Daisy. There is no indication that Katie ever knew of the relationship of Sauls, her husband, with Daisy.

The trial court found the four daughters of Daisy to be the natural children of her and Sauls, but not his heirs, as they are illegitimate and as such not capable of inheriting from their father according to the laws of descent and distribution of the State of Mississippi. The court further found the adoption proceeding in the State of Texas wherein Sauls adopted his granddaughter to be legal and adjudicated this adopted daughter to be an heir and capable of inheriting. There being no appeal as to this finding and conclusion of the lower court, this Court adjudicates nothing thereasto. From a decree in accordance with the findings and conclusions of the chancellor, this appeal is taken.

The appellant assigns for consideration by this Court the following:

''I.   Sufficient and credible evidence supports finding of chancellor that the four sisters (appellants) are the natural children of Edward Burk Sauls and Daisy Eunice Simmons McCaffey Sauls.

"II. Edward B. Sauls was divorced from Katie or Katherine Sauls in Nevada on July 6, 1936; the validity of this divorce judgment cannot be collaterally attacked by appellees.

"A. The evidence is conclusive that adequate process was had on the defendant in the Nevada proceedings.

"B. The divorce proceedings cannot be collaterally attacked by appellees.

"III. The appellants were legitimatized by acts sufficient in law and fact by Edward B. Sauls and Daisy Eunice Simmons Sauls and therefore inherit from their father.

"A. The appellants were legitimatized in Mississippi, as provided by Section 474, Mississippi Code 1942, Annotated.

"B. Not only were appellants legitimatized under the laws of the State of Mississippi, but they were legitimatized under the laws of the State of Louisiana.

"C. The appellants were legitimatized under the laws of the State of Texas.

"IV. Judicial comity commits Mississippi to give legal recognition to the legitimate status of appellants acquired in Louisiana and/or Texas."

The first assignment urged by the appellants, that the four sisters are the natural children of E. B. Sauls, Sr. and Daisy Eunice Simmons McCaffey Sauls, is supported by the overwhelming preponderance of the evidence, and we are of the opinion, and so hold, that the chancellor was correct in his decision in this regard.

The second assignment is the primary question to be determined in this suit, that is, was E. B. Sauls, Sr., legally divorced from his wife Katie on July 6, 1936, in the State of Nevada? Appellants contend the appellees cannot attack the proceeding of a sister state as it amounts to a collateral attack and that since Sauls

himself, if living, could not attack the decree, neither can his children by Mattie Dunn Sauls, or their descendants, attack such decree as they claim through him. We are of the opinion and so hold that this contention is without merit as the appellants put in issue the decree of the Chancery Court of Washoe County, Nevada, by the allegations of their petition and by the introduction of the record, properly authenticated. This placed upon the appellees the burden of overcoming by proof all presumptions legally arising from the rendition of such decree. The proceedings in the Nevada Court and its decree appeared to be regular in form, and consequently such decree imports the existence of all facts necessary to its lawful rendition. ▆▆ ▆ The appellee had the right under these circumstances to refute these presumptions by evidence. Miller v. Miller, 173 Miss. 44, 159 So. 112. Additionally, the Court below held the power of attorney signed "Katherine Sauls" in Lincoln County, Mississippi, was not signed by Katie Sauls, the wife of E. B. Sauls, Sr. This power of attorney appointed one H. D. Danforth attorney in fact for Katherine Sauls and it was by his answer and appearance in the Nevada Court that such court obtained jurisdiction of the divorce proceedings. The decree of divorce was based upon fraud since the jurisdiction of the court was invoked by forgery. This fraudulent decree was subject to collateral attack in any proceeding. Plummer v. Plummer, 37 Miss. 185; Christian v. O'Neal, 46 Miss. 669; Richardson v. Brooks, 52 Miss. 118; McCraney v. N.O. & N.E. RR. CO., 128 Miss. 248, 90 So. 881; Rowell v. Logan, 243 Miss. 479, 138 So. 2d 737.

▆▆ ▆ We move to the decisive question in this suit: Did Katie Sauls sign or authorize anyone to sign for her the power of attorney which was executed before R. Lee Moak, Circuit Clerk of Lincoln County, Mississippi, on June 29, 1936, under the authority of which, her answer and appearance was made conferring juris-

diction upon the Nevada Court for a divorce proceedings. The chancellor found the signature on this instrument to be a forgery, and unless we find this to be manifestly in error, the decision of the lower court should be affirmed.

The acknowledgment states: "On this 29 day of June A.D. 1936, before me, the undersigned, a Notary Public, personally appeared Katherine Sauls, known to me to be the person described in and who executed the above and foregoing instrument and ——he acknowledged to me that ——he executed the same freely and voluntarily and for the uses and purposes therein mentioned." R. Lee Moak, the Circuit Clerk who acknowledged this instrument, died in November 1941. No witnesses are now available to testify concerning the solemn acknowledgment of this instrument. Under these circumstances it is presumed that the officer who made the certificate of acknowledgment did no wrong and perpetrated no fraud. 1 C.J.S., Acknowledgments, Sec. 137. "It is presumed that the officer making a certificate of acknowledgment has certified to the truth and has not been guilty of a wrongful or criminal action. The presumption has been stated to be one of the strongest in the law." See also Mallory, et al v. Walton, et al., 119 Miss. 396, 81 So. 113; White v. Inman, 212 Miss. 237, 54 So. 2d 375; and Jones v. Minton, 244 Miss. 354, 141 So. 2d 564. ██ █ The presumption being one of the strongest in the law, it is fundamental that evidence to overthrow the same must be clear, cogent and convincing. 1 C.J.S., Acknowledgments, Sec. 141: "A high degree of proof is usually held necessary to impeach the certificate, the general rule being that the evidence should be clear, cogent, and convincing, and that loose and inconclusive evidence is not sufficient. In some jurisdictions it is held that the evidence to impeach must be such as produces a conviction amounting to a moral certainty that the certificate is false, and it

has even been said that the evidence must be sufficient to establish the falsity of the certificate beyond a reasonable doubt. Although there is apparently authority to the contrary, the certificate will not ordinarily be overthrown upon a bare preponderance of the evidence; there must be a clear and decided preponderance.''

To the same effect, see Mallory v. Walton, White v. Inman, and James v. Minton, supra. The acknowledgment gives rise to two presumptions: (1) There is a presumption against bad motive, dishonesty and fraud. The certificate of acknowledgment to the power of attorney imports verity and presumption states the truth, and since it purports to bear the signature of Katherine Sauls, presumably it was her actual, personal signature. (2) The presumption also arises that if Katherine Sauls did not actually affix her signature to the instrument, it being acknowledged, then she adopted the writing of some other person as her signature. James v. Minton, supra. The question then arises, did the appellees below overcome these presumptions with clear and convincing evidence? We are of the opinion and so hold that the chancellor was correct in his finding that the appellees had overcome these two presumptions.

The testimony of Mrs. Fay Alford Reagan, who had known Mrs. Katie Sauls from her earliest recollection is highly significant in this regard. This witness lived across the street from Mrs. Katie Sauls from 1926 until she married in 1944, and following that date she was often back in the community and in contact with Mrs. Katie Sauls until her death. This witness identified the signature of Mrs. Katie Sauls upon her will, upon two applications for homestead exemption, identified her handwriting in a letter to the witness, and further identified the signature thereto. She testified that she had seen Mrs. Sauls sign her name many times, and knew her handwriting as well as she knew her own. She then testified positively that the signa-

ture on the power of attorney was not the signature of Mrs. Katie Sauls. The testimony of this witness is not contradicted by other witnesses.

Though we are not experts on the subject of handwriting, we have compared the various exhibits bearing Mrs. Katie Sauls' signature with the signature of Katherine Sauls upon the power of attorney, as we presume the chancellor did, and we cannot help but note the similarity of the signatures on the will of Katie Sauls with the signatures on the applications for homestead exemption, as well as the signature of Katie to the letter to Mrs. Reagan which was introduced in evidence, and the dissimilarity of each and all of these signatures to that affixed to the power of attorney. This evidence is not conclusive with us but it is persuasive when considered with the entirety of the record and the evidence therein portrayed.

Mrs. Reagan and numerous other witnesses testified positively to the fact that E. B. Sauls, Sr., and his wife Katie maintained the same relationship of husband and wife after the pretended divorce as they did prior thereto, even to the time of Katie's death in 1951. These witnesses also testified without contradiction that Katie Sauls was always known as *Katie* and that she was never known as Katherine. The exhibits with the signature of *Katie Sauls* or *Katie* or *Katie B. Sauls* thereon verify this.

Two applications for homestead exemption were introduced in evidence, each postdating the pretended divorce in 1936. Each bear the signature of Mrs. Katie B. Sauls and each name Edward Burk Sauls therein as her husband.

The will of Mrs. Katie B. Sauls was introduced in evidence as an exhibit. This will bears the date of November 12, 1951, and devises all of the property of Mrs. Sauls to "E. B. Sauls, Sr. of Tylertown, Miss." In reflecting upon these exhibits, we can only comment

to the effect that it is highly improbable that Mrs. Sauls would have mentioned E. B. Sauls, Sr., as her husband in the application for homestead exemption a sworn instrument, if it were not so, and that it would be most unlikely that she would have left the entirety of her property to him had she been divorced from him.

The will of Katie B. Sauls was filed for probate by E. B. Sauls, Sr., on May 10, 1954, wherein he swore that he was an adult resident citizen of the State of Mississippi, and that he was the husband of the testatrix, Katie B. Sauls, and wherein he further swore that he was the sole and only heir at law of the testatrix, Katie B. Sauls. These exhibits are uncontradicted. It is of course obvious he could not have been an heir at law, as distinguished from a devisee in a will, if he had been divorced from his wife.

██ The whole of this testimony is so clear, cogent and convincing that the chancellor could not have held otherwise, and we concur therein.

██ The appellants next urge that if the marriage to Katie Sauls was not dissolved by divorce proceedings, the impediment of the marriage was removed on the day of the death of Katie Sauls on November 21, 1951, and the marriage of Sauls to the mother of the four daughters thereupon became lawful and valid without any additional overt act of marriage, so that Daisy became his wife and their offspring, appellants here, became and were legitimate. They cite in support thereof Johnson v. Johnson, 196 Miss. 768, 17 So. 2d 805, which has to do with a common law marriage under circumstances very different from these, primarily that the marriage there was contracted in good faith, which is the antithesis of the marriage here, it being based upon fraud initiated by E. B. Sauls, Sr. Under these circumstances, we conclude this point is not well taken.

The divorce decree of July 6, 1936, being invalid, the marriage of Sauls to Daisy was also invalid. Sauls, therefore, never legally married the mother of the appellants and this is a necessary step to legitimatization by statute in each of the three states involved here.

These points being decisive of the case, we see no need of discussing the other assignments raised by appellants.

The motion of appellees to dismiss the appeal of Louisa Sauls Harney, one of the appellants, is hereby overruled and the cause affirmed.

Affirmed.

*Kyle, P. J., and Ethridge, Gillespie and Brady, JJ.,* concur.