# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00447-COA

**F. MICHAEL MATTHEWS**                                       **APPELLANT**

**v.**

**WHITNEY BANK A MISSISSIPPI STATE**                        **APPELLEES**
**CHARTERED BANK F/K/A HANCOCK BANK,**
**JOY LAMBERT PHILLIPS AS TRUSTEE, AND**
**JAMES KAIGLER**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/31/2018 |
| TRIAL JUDGE: | HON. WILLIAM R. BARNETT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | GEORGE W. HEALY IV |
| ATTORNEYS FOR APPELLEES: | BENJAMIN HARTE HARRIS III |
| | JEFFREY R. BARBER |
| | ELIZABETH JONES FUTRELL |
| | MICHAEL ANTHONY SHAW |
| | GENE D. BERRY |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 08/27/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE J. WILSON, P.J., GREENLEE AND McCARTY, JJ.

### J. WILSON, P.J., FOR THE COURT:

¶1.     Michael Matthews and his wife, Beth, owned A&M Petroleum, a petroleum jobber. To address cash flow issues in A&M's business, the Matthewses obtained two successive home equity lines of credit from Whitney Bank,[1] which were secured by two successive

---

[1] When the Matthewses first dealt with the bank it was known as Hancock Bank. Hancock later merged with Whitney Bank and is now known publicly as Hancock Whitney Bank. However, in this litigation the bank has been referred to primarily as Whitney Bank. For simplicity, we refer to the bank as Whitney Bank throughout the opinion.

deeds of trust on the Matthewses' home. The second deed of trust, executed in 2008, also secured a smaller loan and loan guarantee. However, Michael alleges that his signatures on the deeds of trust and loan documents are all forgeries and that he did not know about the deeds of trust, lines of credit, loan, and loan guarantee until May 2014. In June and July 2014, the Matthewses defaulted on all of their obligations to Whitney Bank. The bank subsequently filed a complaint for a declaratory judgment that the 2008 deed of trust was valid, properly executed by Michael and Beth, and subject to foreclosure by the bank. Michael and Beth filed separate answers, and Beth eventually settled and consented to the entry of a judgment against her. But Michael maintained that the deed of trust and other documents were forged and void, and the case eventually proceeded to trial.

¶2. After the trial, the chancellor found that Michael's signature on the deed was not forged. The chancellor further found that the 2008 deed of trust was valid and subject to foreclosure and that Michael owed in excess of $400,000 on the debts secured by the deed of trust. On appeal, Michael argues that the chancellor erred (1) by applying the presumption of validity that attaches to a properly acknowledged document and (2) by finding that Michael failed to meet his burden of proving forgery. However, we find no reversible error and affirm the judgment of the chancery court.

## FACTS AND PROCEDURAL HISTORY

¶3. In the 1970s, Michael joined his father's business, A&M Petroleum. A&M was a petroleum jobber, meaning that it bought fuel wholesale from refiners and sold it to gas stations. In 1985, Michael married Beth, and they later took over the business. Beth testified

2

that she eventually assumed full responsibility for A&M's finances, bookkeeping, and taxes. She testified that Michael had no involvement in those aspects of the business. Michael was responsible for operations, sales, and customer relations.

¶4. After Hurricane Katrina, A&M began to experience cash flow problems. A&M's suppliers required A&M to pay cash on delivery, but A&M allowed its customers thirty days or more to make payment. To address the cash flow problems that this "timing gap" created, the Matthewses secured several loans from Whitney Bank between 2007 and 2013.

¶5. In July 2007, the Matthewses obtained a home equity line of credit (HELOC) from Whitney Bank. The Matthewses executed a deed of trust covering their home to secure the HELOC. Beth testified that she met with Whitney Bank employees James Kaigler and John Hall to discuss the HELOC. On the advice of counsel, Beth asserted her Fifth Amendment privilege against self-incrimination and refused to say whether she showed Michael the deed of trust or whether he signed it.

¶6. Sidney Rice, an employee of Whitney Bank, notarized the 2007 deed of trust. Rice testified that if he knew a customer well enough to recognize his or her voice on the phone, if the customer told him by phone that he or she had signed a document, and if he had no doubt that the customer had in fact signed the document, then he would notarize the document even if the customer was not present. Rice testified that Beth took the 2007 deed of trust home for Michael to sign and later returned to the bank with the signed document. Rice testified that he called Michael, and Michael confirmed his signature by phone.[2] Rice

_____

[2] Telephonic acknowledgments are not permitted in this State. The notary is required to affirm that the principal "[p]ersonally appeared before" the notary. Miss. Code Ann.

3

then notarized the deed of trust, but he did not record the event in his notarial register.[3]

Michael denied that he ever signed the deed of trust or credit agreement or confirmed his signature by phone.

¶7.     In February 2008, the Matthewses obtained a new $326,000 HELOC from Whitney Bank.  The Matthewses executed a new deed of trust covering their home.  The deed of trust secured not only the HELOC but also all other existing and future debts and liabilities owed by the Matthewses to Whitney Bank.

¶8.     The Matthewses used the new HELOC to pay off the prior HELOC.  The Matthewses defaulted on the HELOC in July 2014.  As of October 2017, they owed $326,186.98 on the HELOC.  At trial, Beth asserted her Fifth Amendment privilege against self-incrimination and refused to say whether Michael signed the new credit agreement or 2008 deed of trust. Michael denied that he ever saw or signed the credit agreement or deed of trust.

¶9.     Deborah Estes notarized the 2008 deed of trust.  Estes was a friend of the Matthewses, and her husband, an attorney, had done legal work for the Matthewses in the past.  Beth testified that Estes notarized the deed of trust even though she (Beth) signed it outside of

§ 89-3-7 (Rev. 2011).  "A notary shall not perform a notarial act if the principal . . . is not in the notary's presence at the time of notarization . . . ."  Miss. Admin. Code § 1-5-5.1(B); *see also id.* § 1-5-1.3 ("'Acknowledgment' means a notarial act in which an individual . . . appears in person before the notary and presents a document . . . and indicates that the signature on the document was voluntarily affixed by the individual . . . ."); *id.* § 1-5-1.5 ("'Appears in person before the notary' means that the principal and the notary are physically close enough to see, hear, communicate with, and give identification documents to each other.").

[3] Notaries are required by statute to keep a register of their official acts.  Miss. Code Ann. § 25-33-5 (Rev. 2018).

Estes's presence. However, Estes testified that she will not notarize a document unless the principal is physically present. Indeed, Estes testified that she could not recall a single time when she had notarized a document when the principal was not present. Estes could not specifically recall notarizing the 2008 deed of trust. However, she had no reason to believe that she would have departed from her normal practice. In other words, she had no reason to believe that Michael was not present when she notarized the deed of trust with his signature. On cross-examination, Estes admitted that on rare occasions she would notarize a document that had already been signed. However, she testified that she would only do so when the principal personally presented the document to her. Even then, she usually had the signatory sign the document again in her presence so that she could witness the signature. Estes admitted that she did not record her notarization of the 2008 deed of trust in her notarial register.

¶10.   In May 2013, Beth signed a promissory note in favor of Whitney Bank for the principal amount of $49,500. Beth signed the note on behalf of Sow and Son LLC.[4] Michael and Beth each signed a commercial guaranty of the note. Michael alleges that his signature was forged. Sow and Son failed to make payments due under the promissory note, and in June 2014 the Matthewses failed to make payment as guarantors of the note. As of October 2017, they owed $47,941.38 as guarantors of the Sow and Son note.

¶11.   On October 30, 2013, Michael signed a promissory note in favor of Whitney Bank in the principal amount of $30,000. The loan was guaranteed by Beth. In June 2014, Michael

---

[4] Beth and the Matthewses' son, Luke, owned Sow and Son, which operated a gas station.

defaulted on the promissory note. As of October 2017, he owed $28,276.51 on the note. He alleges that his signature on the note is a forgery.

¶12. Thus, in June and July 2014, the Matthewses defaulted on the HELOC, the Sow and Son guarantees, and the October 30, 2013 promissory note—all of which were secured by the 2008 deed of trust. Whitney Bank subsequently filed suit against the Matthewses. Whitney Bank's complaint sought, among other forms of relief, a declaratory judgment that the 2008 deed of trust was valid and binding as to both Michael and Beth and that the bank was entitled to foreclose under the deed of trust.

¶13. Michael answered and filed counterclaims against Whitney Bank.[5] Michael alleged that Beth was responsible for all of the "financial aspects" of A&M. He claimed that on May 28, 2014, their son, Luke, found a notice from the Mississippi Department of Revenue (MDOR) that stated that A&M had not remitted sales taxes from January 2013 through March 2014 and owed a total of $463,107.93 to the State, including penalties and interest. Michael alleged that he had no prior knowledge of A&M's tax delinquency. He alleged that he later found a note from Beth apologizing for her mishandling of A&M's finances. Michael claimed that he subsequently discovered that his signature had been forged on the 2008 deed of trust and other loan documents at issue in this litigation.

¶14. Beth filed a separate answer and counterclaims against Whitney Bank. Beth alleged

---

[5] Whitney Bank filed a complaint and later an amended complaint, and Michael and Beth filed separate answers and counterclaims to the complaint and the amended complaint. Michael's counterclaims named additional counter-defendants. All of their counterclaims were dismissed with prejudice either before or after trial. The counterclaims do not require any further discussion in the context of the issues raised in this appeal.

6

that she "reasonably believed that she had the authority, approval and consent of [Michael] to sign his name on documents, when necessary, to manage the business and the personal affairs of their family." Specifically, Beth alleged that she "reasonably believed" that she had the authority to sign Michael's name to the deeds of trust and other documents at issue in this case. Beth also alleged, "[u]pon information and belief," that James Kaigler of Whitney Bank "was in regular communication with . . . Michael . . . during all pertinent times." Finally, Beth alleged that "[a]ll of the funds received by the Matthews[es] as a result of these bank transactions were utilized for the Matthews[es]' business and personal affairs."

¶15. Beth subsequently consented to the entry of a judgment against her in the total amount of $532,125.80. Beth's counterclaims were dismissed with prejudice. Whitney Bank's claims against Michael eventually proceeded to trial.

¶16. At trial, Michael claimed that he never discussed A&M's finances with Beth. He testified that he was not aware of any cash flow issues until May 2014 when he received notice of A&M's tax delinquency from MDOR. Michael testified that he tried to call Beth but could not reach her. When he returned home that night, he found what he interpreted as a suicide note on Beth's computer. The next day, Michael located Beth in Hattiesburg. She had not committed suicide. Michael then went to Whitney Bank to determine the extent of A&M's financial issues. James Kaigler showed Michael the deed of trust and other loan documents.

¶17. Michael denied that he signed the deeds of trust or any of the loan documents. He also testified that he never authorized Beth to sign the documents for him. Michael gave

7

handwriting samples at his deposition, and he testified that the signatures on the documents at issue in this case differed significantly from his true signature.

¶18. Following the trial, the chancellor entered an opinion finding that Michael did not meet his burden of proving by clear and convincing evidence that the notarized signatures were forged. The chancellor also found that the notarized signatures were similar to the signatures on the other relevant loan documents and were not obviously different from the signatures that Michael conceded were genuine. The chancellor found that the 2008 deed of trust was valid, that Michael was liable on the debts secured by the deed of trust, and that Whitney Bank was entitled to foreclose under the deed of trust. The chancellor subsequently entered a final judgment against Michael that granted declaratory relief consistent with the opinion's findings.

¶19. Michael filed a motion to amend the judgment or for a new trial, which was denied, and a notice of appeal. However, Michael did not obtain a supersedas bond to stay the judgment pending appeal. While the appeal was pending, Whitney Bank foreclosed on the Matthewses' home under the 2008 deed of trust. Whitney Bank purchased the property for a credit bid against the indebtedness owed under the judgment.[6]

¶20. On appeal, Michael argues that the chancellor erred (1) by applying the presumption of validity that attaches to a properly acknowledged document and (2) by finding that Michael failed to meet his burden of proving that the 2008 deed of trust and other loan

---

[6] In its brief on appeal, Whitney Bank argues that the foreclosure renders the appeal partially moot. However, the foreclosure does not render the appeal entirely moot. Because we affirm the judgment of the chancery court, it is unnecessary to consider what effect the foreclosure might have had on the appeal.

documents were forged.[7]

## ANALYSIS

¶21. "This Court employs a limited standard of review in reviewing the decisions of a chancellor." *Woodell v. Parker*, 860 So. 2d 781, 785 (¶10) (Miss. 2003). "[W]e do not here consider the evidence de novo but rather . . . apply the familiar substantial evidence/ manifest error test." *Johnson v. Black*, 469 So. 2d 88, 90 (Miss. 1985). "The findings of a chancellor will not be disturbed unless this Court finds the chancellor abused his discretion, was manifestly wrong or made a finding which was clearly erroneous." *Woodell*, 860 So. 2d at 785 (¶10). We also defer to the chancellor as to the weight and credibility of the witnesses and the weight of the evidence. *Id.*; *Culbreath v. Johnson*, 427 So. 2d 705, 708 (Miss. 1983); *Mayton v. Oliver*, 247 So. 3d 312, 322 (¶33) (Miss. Ct. App. 2017).

### I. The Notarial Presumption

¶22. "When a party challenges the validity of a properly-acknowledged deed, that party must overcome several presumptions favoring the legitimacy of the document. The first presumption provides that, where a deed is properly acknowledged, the instrument is presumed to be authentic because the certificate of acknowledgment infers verity and presumptively states the truth." *Mapp v. Chambers*, 25 So. 3d 1096, 1101 (¶22) (Miss. Ct. App. 2010) (citation omitted). As our Supreme Court has stated, "[i]t is presumed that the [notary] making a certificate of acknowledgment has certified to the truth and has not been

---

[7] Michael also argues (1) that the 2007 deed of trust is also void and therefore cannot be reinstated if the 2008 deed of trust is held void and (2) that Whitney Bank is not entitled to any alternative "equitable remedy" if the deeds of trust are held void. Because we affirm the chancellor's ruling that the 2008 deed of trust is enforceable, these issues are moot.

guilty of a wrongful or criminal action. *The presumption has been stated to be one of the strongest in the law*." *Sapukotana v. Sapukotana*, 179 So. 3d 1105, 1114 (¶26) (Miss. 2015) (quoting *Nichols v. Sauls' Estate*, 250 Miss. 307, 165 So. 2d 352, 356 (1964)) (emphasis added). "This presumption can be overcome only by clear and convincing evidence." *Mapp*, 25 So. 3d at 1101 (¶22). In this case, the chancellor found that the 2008 deed of trust was properly acknowledged and that Michael did not overcome the notarial presumption of validity by clear and convincing evidence.

¶23. Michael argues that the chancellor should not have applied the presumption of validity because "both notaries abandoned their acknowledgments and admitted their departure from proper notarial procedure." However, Michael's claim that Deborah Estes "abandoned" her acknowledgment of the 2008 deed of trust is not supported by the record,[8] and we find no error in the chancellor's application of the notarial presumption.

¶24. Deborah Estes notarized the 2008 deed of trust. She testified at trial that she did not have a specific recollection of notarizing the deed, but she had no reason to believe that she would have departed from her standard practices. In other words, she believed that Michael signed the document in her presence. Estes testified that people sometimes asked her to sign documents that they had already signed. Estes testified that her usual practice would be to insist that the principal sign the document again in her presence. On cross-examination, Estes seemed to concede that she might have, at some point in the past, notarized a document that was not signed in her presence—but only if the principal personally presented the

---

[8] As noted above, we need not address the validity of the 2007 deed of trust or its notarization by Sidney Rice.

document to her. Estes went on to testify that she would not notarize a document if it was signed outside of her presence by someone other than the person who presented it to her. Estes testified that she could not recall ever notarizing a single document under those circumstances.

¶25. Michael claims that his signature was forged on the 2008 deed of trust and that he was not present when Estes notarized the document. Estes, however, testified that it would have been contrary to her standard practices as a notary to notarize a document under such circumstances. By the time of trial, nine years after the fact, Estes did not have a specific recollection of notarizing the deed of trust. But her testimony as to her standard practices as a notary is competent evidence that she acted in conformity with those practices on this particular occasion. M.R.E. 406 ("Evidence of a person's habit . . . may be admitted to prove that on a particular occasion the person . . . acted in accordance with the habit . . . . The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness."). Estes has been a notary since 2000, and she testified that it has always been her practice to require the principal's physical presence. Her testimony was sufficient "to base an inference of systematic conduct and to establish [her] regular response to a repeated specific situation." *Hooker v. State*, 716 So. 2d 1104, 1111 (¶24) (Miss. 1998) (applying M.R.E. 406) (quotation marks omitted). The chancellor did not clearly err by finding that Estes notarized the document and, therefore, that the notarial presumption of validity applied. *See Wallace v. State*, 264 So. 3d 1, 6-7 (¶¶22-25) (Miss. Ct. App. 2018) (Wilson, J., concurring in result only) (concluding that an attorney's testimony that he always

11

communicated plea offers to his clients was sufficient to support the trial court's finding that he communicated a plea offer on a particular occasion).

¶26. Estes did admit that she failed to record her notarization of the deed of trust in her notarial register. Her failure to do so was contrary to Mississippi Code Annotated section 25-33-5, which provides that "[e]very notary shall keep a fair register of all his official acts[.]" Miss. Code Ann. § 25-33-5 (Rev. 2018). However, a mere "failure to strictly follow form" does not render an acknowledgment invalid when, as in this case, "the acknowledgment contains all the necessary information." *Estate of Dykes v. Estate of Williams*, 864 So. 2d 926, 931 (¶21) (Miss. 2003). The statute requiring the notary to keep a register "does not indicate that a notarization not properly recorded in the notary's log book is void. Nor does it indicate that the notarized document is rendered defectively acknowledged due to the recordation failure." *In re Jefferson*, Case No. 11-51958 (Adv. No. 11-05059), 2015 WL 359901, at *5 (Bankr. S.D. Miss. Jan. 26, 2015) (citing *Estate of Dykes*, *supra*). The failure to maintain such a register could result in suspension of the notary's commission. *See* Miss. Admin. Code § 1-5-7.2 ("The Secretary of State may suspend a notary commission for actions contrary to the Mississippi Notary Law . . . ."). However, it does not invalidate an otherwise proper acknowledgment. In this case, there was sufficient evidence for the chancellor to find that Estes properly acknowledged the deed of trust. Therefore, the chancellor did not clearly err by applying the notarial presumption of validity.

## II. Alleged Forgery

¶27. Michael also argues that the chancellor clearly erred by finding that the deed of trust

and loan documents were not forged. Michael argues that the chancellor ignored "obvious" differences between the allegedly forged signatures and his true signature. He also argues that his testimony was corroborated by Beth's testimony and assertion of her Fifth Amendment privilege against self-incrimination.

¶28. In his opinion, the chancellor found:

> The documentary evidence introduced at trial purportedly signed by Mr. Matthews each contains a similar signature. Mr. Matthews introduced exemplars of what he purports to be his genuine signature. While there was no lay witness or expert witness offered by either side concerning the bank signatures, none was required. This Court finds it could determine that the contested signatures were forged if the purported genuine signatures and the purported forged signatures were obviously different. The Court finds . . . that, while the signatures are not exactly similar, they are not so dissimilar as to make the purported forged signatures obvious forgeries.

The chancellor also noted that Michael testified that he did not sign the documents, while Beth "refused to testify" on the subject.

¶29. To overcome the notarial presumption, it was Michael's burden to prove forgery by clear and convincing evidence. *Mapp*, 25 So. 3d at 1101 (¶22). "Clear and convincing evidence is such a high evidentiary standard that it surpasses even the standard of overwhelming weight of the evidence." *Miss. Comm'n on Judicial Performance v. Shoemake*, 191 So. 3d 1211, 1218 (¶26) (Miss. 2016) (quotation marks omitted). As an appellate court, we must "bear in mind" this high standard in determining whether there is sufficient evidence to support the chancellor's findings. *Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987). "Where the appealing party has such a burden at trial, he necessarily has a higher hill to climb on appeal . . . ." *Id.* Stated differently, the quantum of evidence

13

necessary to affirm the chancellor's findings "is less than it would be if the preponderance of the evidence rule applied." *Id.*

¶30.     The chancellor did not clearly err by finding that Michael failed to meet his burden of proof.  Although Michael denied signing the document, the Mississippi Supreme Court "has long been committed to the doctrine that the testimony of parties in interest is not sufficient to overturn such a certificate."  *Bowers v. Fields*, 148 So. 358, 358 (Miss 1933) (citing *Mallory v. Walton*, 119 Miss. 396, 81 So. 113, 114 (Miss. 1919)).

¶31.     Moreover, the chancellor was not *required* to infer forgery from Beth's assertion of her privilege against self-incrimination.  In a civil case, an adverse inference *may* be drawn from a defendant's assertion of the privilege—i.e., it is "permissible" for the fact-finder to draw such an inference.  *Morgan v. U.S. Fid. & Guar. Co.*, 222 So. 2d 820, 828 (Miss. 1969).  However, the fact-finder is not required to do so.  In addition, the rule permitting an adverse inference "has only been applied in Mississippi to the actual parties to a civil action."  *Gibson v. Wright*, 870 So. 2d 1250, 1260 (¶42) (Miss. Ct. App. 2004).  In this case, Beth settled and consented to the entry of judgment against her prior to trial.  She was not a party at trial. Finally, the chancellor could have been persuaded that an adverse inference was not warranted on the particular facts of this case.  Beth and Michael are still married, and Michael is seeking to prevent foreclosure on the marital home.  Under these circumstances, a plausible inference is that Beth thought that she could help Michael's case and save their home by "pleading the Fifth."  In any event, it is sufficient to say that the chancellor was not required to draw any particular inference from Beth's assertion of her privilege.  The

14

chancellor did not clearly err by declining to infer forgery.

¶32. Michael also argues that the chancellor erred by not appointing a handwriting expert to opine on the authenticity of the signatures. The possibility of a court-appointed expert was discussed briefly at a pretrial hearing; however, Michael took no further action on the issue. He did not file any motion requesting a court-appointed expert and also failed to designate an expert of his own. Indeed, in his answer and again in his opening statement at trial, Michael specifically argued to the court that a handwriting expert was unnecessary. Michael waived this issue by failing to raise it in the trial court. *City of Hattiesburg v. Precision Constr. LLC*, 192 So. 3d 1089, 1093 (¶18) (Miss. Ct. App. 2016) (holding that "it is not sufficient to simply 'discuss' or mention an issue at a hearing"—the issue is waived unless it is specifically "presented to [the trial judge] for decision").

¶33. Moreover, the Supreme Court and this Court have stated that "[t]he appointment of an expert by the court under Mississippi Rule of Evidence 706 is done sparingly, and then only in exceptional cases involving complex issues where the expert's testimony would be helpful to the trier of facts." *Heigle v. Heigle*, 771 So. 2d 341, 349 (¶29) (Miss. 2000) (quoting *Trilogy Commc'ns Inc. v. Thomas Truck Lease Inc.*, 733 So. 2d 313, 317 (¶10) (Miss. Ct. App. 1998)). We review a trial judge's decision to appoint or not appoint an expert for abuse of discretion. *Id.* at 749 (¶¶28-30); *Trilogy Commc'ns*, 733 So. 2d at 317 (¶10). We cannot say that the chancellor abused his discretion by not appointing an expert sua sponte.

¶34. There is sufficient evidence in the record to support the chancellor's finding that

15

Michael failed to meet his burden of proving forgery by clear and convincing evidence. Estes's testimony was competent evidence that Michael did, in fact, sign the 2008 deed of trust. In addition, there was other evidence from which the chancellor could have inferred that Michael was aware of the loans from Whitney Bank and that Michael's denials were not credible. For example, the Matthewses' tax returns, which Michael admittedly signed, showed mortgage interest deductions and attached mortgage interest statements from Whitney Bank. Sidney Rice also testified that he confirmed with Michael that he had signed the 2007 deed of trust. Although Rice's notarization of the 2007 deed of trust was deficient (*see supra* note 2), Rice's testimony nonetheless rebuts Michael's claims that he knew nothing about any of the loans at issue. Based on the totality of the evidence, the chancellor could have determined that Michael's testimony was not credible. At a minimum, the chancellor could have determined that Michael's testimony was insufficient to meet his high burden of proof.

## CONCLUSION

¶35. The chancellor did not clearly err by applying the notarial presumption or by finding that Michael failed to meet his burden of proof.

¶36. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. TINDELL, J., NOT PARTICIPATING.**

16